# PUTNAM *v.* UNITED STATES.

## SAME *v.* SAME.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW HAMPSHIRE.

Nos. 573, 574. Submitted January 28, 1896. — Decided May 4, 1896.

An indictment against its president for defrauding a national bank, described the bank as the "National Granite State Bank," "carrying on a national banking business at the city of Exeter." The evidence showed that the authorized name of the bank was, the "National Granite State Bank of Exeter." *Held,* that the variance was immaterial.

Conversations with a person took place in August, 1893. In December, 1893, he testified to them before the grand jury which found the indictment in this case. On the trial of this case his evidence before the grand jury was offered to refresh his memory as to those conversations. *Held,* that that evidence was not cotemporaneous with the conversations, and would not support a reasonable probability that the memory of the witness, if impaired at the time of the trial, was not equally so when his testimony was committed to writing; and that the evidence was therefore inadmissible for the purpose offered.

On the trial of a national bank president for defrauding the bank, a witness for the government was asked, on cross-examination, as to the amount of stock held by the president. This being objected to, the question was ruled out, as not proper on cross-examination, the government "not having opened up affirmatively the ownership of the stock." *Held,* that, as the order in which evidence shall be produced is within the discretion of the trial court, and as the matter sought to be elicited on the cross-examination for the accused was not offered by him at any subsequent stage of the trial, no prejudicial error was committed by the ruling.

When an offence against the provisions of Rev. Stat. § 5209 is begun in one

State and completed in another, the United States court in the latter State has jurisdiction over the prosecution of the offender.

The proof of guilt in this case was sufficient to warrant the court in leaving to the jury to decide the question of the guilt of the accused.

The sentence on both counts having been distinct as to each, the entire amount of punishment imposed will be undergone, although the conviction and sentence as to the second count are set aside.

THIS case having been submitted, the court ordered the judgment below to be affirmed. Subsequently, that judgment was vacated. The case is stated in the opinion.

*Mr. Frank S. Streeter* for plaintiff in error.

*Mr. Solicitor General* for defendant in error.

MR. JUSTICE WHITE delivered the opinion of the court.

This is a writ of error to obtain a reversal of a judgment of the Circuit Court of the United States for the District of New Hampshire, entered on a verdict of a jury, finding the defendant guilty upon the second and seventh counts of an indictment which alleged violations of the provisions of section 5209 of the Revised Statutes.

The indictment originally consisted of ten counts. A demurrer to counts 3, 5 and 8 was sustained. Upon the trial, at the close of the evidence for the prosecution, counts 4, 6, 9 and 10 were withdrawn from the consideration of the jury, and the case was submitted to them on counts 1, 2 and 7. Counts 1 and 2 covered the same transaction, count 1 charging an embezzlement, while count 2 charged an unlawful abstraction of the same property.

The second count charged the defendant, as president of the " National Granite State Bank," with having, on July 26, 1893, at Exeter, New Hampshire, unlawfully abstracted and converted to his own use certain described bonds and obligations, the property of said association.

The seventh count charged that the defendant, while president as aforesaid, and at the place aforesaid, did, between January 1, 1893, and July 15, 1893, "unlawfully and wilfully, and without

.the knowledge and consent of said association, and with intent to injure and defraud said association, abstract and convert to his own use the moneys, funds and credits of the property of said association, to wit, forty thousand dollars of the moneys, funds and credits of said association, a more particular description of which moneys, funds and credits is to the said jurors unknown." Before the trial, a statement of the items upon which the government intended to rely for a conviction under the seventh count was furnished, by the district attorney, to counsel for the accused, and the court limited the evidence with reference to that count to matters embraced in the list. The specification referred to fifteen sums, each of which was stated to have been drawn by the accused upon checks signed by him, in the name of the bank as its president, and made payable to the order of the American Loan and Trust Company of Boston, or to the order of H. N. Smith on the National Bank of Redemption, a banking institution located and doing business at Boston. The checks were delivered by the defendant to the payees thereof in Boston in return " for cash or funds in the form of checks or drafts" handed to him in Boston, and the checks were paid by the Boston bank on whom they were drawn.

A motion in arrest of judgment having been overruled, the court, on January 31, 1895, separately sentenced the defendant on each count to five years imprisonment in the state-prison at Concord, but ordered that the imprisonment under the seventh count should be concurrent with that under the second count.

The errors assigned are eighteen in number. In addition a second writ of error was sued out, and on this writ errors were assigned relating solely to the validity of the sentence imposed. This second writ was separately docketed and numbered in this court. We are relieved from considering the legality of this second writ, as well as the soundness of the errors thereon assigned, as all the matters complained of thereon were abandoned on the hearing.

Of the eighteen assignments of error, four (Nos. 7, 8, 11 and 18) are not pressed by counsel, and need not be reviewed.

Ten assignments (Nos. 1 to 6 and 13 to 16) affect both of the counts upon which conviction was had, and relate to an asserted variance between the name of the bank alleged in the indictment to have been defrauded and the name established by the proof. Assignment No. 9 affects the second count alone, and alleges error in permitting a witness for the prosecution, upon his direct examination, to refresh his memory in a manner claimed to be illegal. Assignment No. 10 alleges error in the sustaining of objections to questions as to the amount of stock of the bank owned by the defendant during the period when the alleged unlawful acts referred to in the seventh count were committed, while assignments Nos. 12 and 17 attack the jurisdiction of the court over the offence set forth in the seventh count.

We will consider the questions which arise from these assignments in the order in which they have just been mentioned.

1. *Variance asserted to exist between the name of the bank charged in the indictment and the name as established by the proof.*

The bank alleged to have been defrauded was referred to in the indictment as "a certain national banking association, then and there known and designated as the National Granite State Bank, which said association had been heretofore created and organized under and by virtue of the laws of the United States of America, and which said association was then and there acting and carrying on a national banking business at the city of Exeter under the laws aforesaid."

The evidence offered proved that the authorized name of the bank was the National Granite State Bank of Exeter, the omission of the words "of Exeter" being, therefore, the variance relied on. The court held that this was not material, if the bank carried on its business and was as well known by the one name as the other.

The text writers state the rule to be that where the name of a third person is used in an indictment, it must be proved as laid. (Whart. Crim. Ev. sec. 102a; 1 Bish. Crim. Proc. sec. 488, sub. 3, and sec. 667, sub. 3.) Many authorities illustrating this rule are referred to in the brief of counsel. We

notice only the two cases principally relied on, to wit: *Mc-Gary* v. *People*, 45 N. Y. 153, and *Sykes* v. *People*, 132 Illinois, 32. Both of these cases are in conflict with *Commonwealth* v. *Jacobs*, 152 Mass. 276, in which last case the rule is laid down as declared by the trial court in the case at bar. However, the case now before us is distinguishable from that presented in *McGary* v. *People*, and *Sykes* v. *People, supra*, from the fact that the variance relied on in those cases was in an integral part of the name proper, whilst here it consists simply in the omission of the words "of Exeter," which, whilst a part of the name, would be commonly understood as referring only to the place of business of the corporation. A case precisely in point is *Rogers* v. *State*, 90 Georgia, 463, where a railroad company was referred to in an indictment by the name under which it usually transacted business, and it was held, in a well reasoned opinion, that the omission of the words "of Georgia" at the close of the designated name of the company was not a fatal variance.

In the indictment at bar, the accused was charged as president of the bank, and it was alleged that the institution carried on business at Exeter. It is impossible, therefore, to suppose that the omission of the words "of Exeter" could have in any way misled the defendant, or failed to convey to his mind what bank was intended to be referred to. It is. manifest, therefore, that the omission could not have operated to his prejudice. These views dispose of assignments from 1 to 6.

2. *Error averred to have been committed by the court in permitting the prosecution to refresh the memory of a witness, called by it, by reference to certain testimony previously given by the witness before the grand jury.*

The ruling of the court from which this error is asserted to have resulted was made during the examination in chief of C. M. Dorr, a witness for the prosecution. He was a bank examiner, and was being questioned as to the whereabouts of certain bonds referred to in the second count of the indictment. The testimony of the witness was important, and the matter as to which he was being examined had a direct bear-

ing upon the guilt or innocence of the accused. The bill of exceptions discloses what took place at the time of the ruling, as follows :

"Q. Did he ever, at any time, tell you what he had done with these bonds?

"A. Not that I now recollect.

"Mr. Branch : I propose to ask this witness a leading question, because I am taken by surprise at his answer. I have his testimony before the grand jury, and I wish to ask him if he did not testify to certain things before the grand jury.

"The Court : You may do that.

"Mr. Streeter : To that I object and except.

"The Court: It is a matter of discretion with the court to allow counsel on either side who say they are surprised to ask such question. It is not a matter of exception.

"By Mr. Branch :

"Q. (Referring to minutes, and apparently reading for the purpose of putting the question.) Do you now recollect that you testified before the grand jury that when you discovered those bonds were gone you went to Boston and learned that Mr. Putnam had them, and that he acknowledged to you he had those bonds on the 3d day of August? Did you not so testify before the grand jury ?

"A. If it is a matter of record, I suppose that it is so. Mr. Putman done considerable of the business by letters.

"Q. I am asking if you did not so testify before the grand jury ?

"A. If it is a matter of record, I do not dispute the record.

"Q. Do you not recollect that fact that you asked him what he had done with them?

"Mr. Streeter : I still object and except to this because it is the record taken before the grand jury and should not be introduced here ; it is improper and I object to it.

"The Court: I do not think you ought to say it is improper after the court has ruled that it is.

"Mr. Streeter : I beg your honor's pardon ; I did not understand that you had ruled on this point.

"The Court : It is a thing often done, and when counsel say

they are surprised by the way a witness recollects a thing it is within the discretion of the court to allow counsel to direct the attention of the witness to something which may refresh his recollection.

" By the Court :

" Q. Do you recollect this conversation in view of your attention being now called to it ?

" A. I do not recall distinctly where I had that interview, but I think it must have been at the station at Exeter.

" Q. It is not a question of where it must have been, but whether you recall it now.

" By Mr. Branch :

" Q. Let me refresh your recollection a little further.    Did you testify before the grand jury that you said to him something about the bond, and he said, ' Mr. Dorr, I will state to you I am not going away ? '

" A. Yes, sir ; I did.

" Mr. Streeter: I object to the reading here before this tribunal of the records taken before the grand jury — records of the grand jury room — and I renew the objection I took when my brother first put it in, two or three minutes ago.    I renew the objection I then took to the production of grand jury records before this court.

" Mr. Branch : I am not.

" The Court : It is competent.

" Mr. Streeter : I except.

" Q. And did he not say, ' I will get the bonds for you as soon as I can ? '

" A. Yes ; I can assent to that.

" The Court : It must be understood that the putting into the question a conversation is merely done for the purpose of directing the witness's attention to the matter, and that it is not in, unless the witness remembers the conversation and states it here.

' Mr. Streeter : If your honor will pardon me, my exception to its being read is in the record, and I do not want to be deprived of that.

" The Court : That is all right."

Many objections are pressed upon our attention which are alleged properly to arise from the exceptions which were taken during the proceedings just quoted, but which we deem either unfounded or not reserved by the exception as taken.

It is settled that a trial court can, in its discretion, permit, upon direct examination, a leading question to be asked, when the counsel conducting the examination is surprised by the statements of the witness. *St. Clair* v. *United States*, 154 U. S. 134, 150. It is also clear that where a memorandum or writing is presented to a witness for the purpose of refreshing his memory, it must either have been made by the witness or under his direction, or he must be connected with it in such a way as to make it competent for the purpose for which it is proposed to use it. But here the objection below did not address itself to the fact that the minutes of the testimony taken before the grand jury had not been properly authenticated or that they had not been reduced to writing in the presence of the witness or read over or examined by him at the time. The exception taken, therefore, reserves none of these questions. We shall hence, in considering the matter, assume that in these particulars the use of the testimony taken before the grand jury to refresh memory was not objectionable.

It is elementary that the memory of a witness may be refreshed by calling his attention to a proper writing or memorandum. The rule is thus stated by Greenleaf (1 Greenl. Ev. § 436):

"Though a witness can testify only to such facts as are within his own knowledge and recollection, yet he is permitted to refresh and assist his memory, by the use of a written instrument, memorandum or entry in a book, and may be compelled to do so if the writing is presented in court. It does not seem to be necessary that the writing should have been made by the witness himself, nor that it should be an original writing, provided, after inspecting it, he can speak to the facts from his own recollection. So, also, where the witness recollects that he saw the paper while the facts were fresh in his memory, and remembers that he then knew that the particu-

lars therein mentioned were correctly stated. And it is not necessary that the writing thus used to refresh the memory should itself be admissible in evidence: for if inadmissible in itself as for want of a stamp, it may be still referred to by the witness."

The very essence, however, of the right to thus refresh the memory of the witness is, that the matter used for that purpose be contemporaneous with the occurrences as to which the witness is called upon to testify. Indeed, the rule which allows a witness to refresh his memory by writings or memoranda is founded solely on the reason that the law presupposes that the matters, used for the purpose, were reduced to writing so shortly after the occurrence, when the facts were fresh in the mind of the witness, that he can with safety be allowed to recur to them in order to remove any weakening of memory on his part, which may have supervened from lapse of time.

In *Maxwell* v. *Wilkinson*, 113 U. S. 656, 658, speaking through Mr. Justice Gray, the court said:

" Memoranda are not competent evidence by reason of having been made in the regular course of business, unless contemporaneous with the transaction to which they relate. *Nicholls* v. *Webb*, 8 Wheat. 326, 337; *Ins. Co.* v. *Weide*, 9 Wall. 677, and 14 Wall. 375; *Chaffee* v. *United States*, 18 Wall. 516.

" It is well settled that memoranda are inadmissible to refresh the memory of a witness unless reduced to writing at or shortly after the time of the transaction, and while it must have been fresh in his memory. The memorandum must have been ' presently committed to writing,' Lord Holt in *Sandwell* v. *Sandwell*, Comb. 445; *S. C.* Holt, 295; ' while the occurrences mentioned in it were recent, and fresh in his recollection,' Lord Ellenborough in *Burrough* v. *Martin*, 2 Camp. 112; ' written contemporaneously with the transaction,' Chief Justice Tindal in *Steinkeller* v. *Newton*, 9 Car. & P. 313; or ' contemporaneously or nearly so with the facts deposed to,' Chief Justice Wilde (afterwards Lord Chancellor Truro) in *Whitfield* v. *Aland*, 2 Car. & K. 1015. See, also, *Burton* v. *Plummer*, 2 Ad. & El. 341; *S. C.* 4 Nev. & Man. 315; *Wood*

v. *Cooper*, 1 Car. & K. 645; *Morrison* v. *Chapin*, 97 Mass. 72, 77; *Spring Garden Ins. Co.* v. *Evans*, 15 Maryland, 54."

In appreciating what length of time after the occurrence may be considered as "contemporaneous," as "shortly after the time of the transaction," or "while fresh in his recollection," courts have differed somewhat, depending of course upon the facts of each particular case.

In *Wood* v. *Cooper*, 1 Car. & K. 645, 646, a witness was allowed to look at his examination before commissioners in bankruptcy, signed by him, given within a fortnight of the time of the happening of certain occurrences, and when the facts were fresh in his memory. So in *State* v. *Colwell*, 3 R. I. 132, a witness was allowed to refer to a memorandum made a day or two after a previous trial, when an interval of about eight days had elapsed from the time when the occurrences transpired concerning which the witness gave testimony. In *Billingslea* v. *State*, 85 Alabama, 323, it was held proper to allow a witness to refresh his recollection by resort to the minutes of statements made to a grand jury within a week after the occurrence about which he was being interrogated. In *Spring Garden Mutual Ins. Co.* v. *Evans*, 15 Maryland, 54, it was held that a witness, who, five months after the occurrence of certain facts, and at the request of a party interested, made a statement in writing and swore to it, could not be allowed to testify to his belief in its correctness.

In the case at bar the indictment was found at the December term, 1893, of the District Court, and the testimony used to refresh the memory of the witness was given at that time before the grand jury. The conversations to which the testimony of the witness, given before the grand jury, related transpired on the third of the previous August. The effort, therefore, was to refresh the memory of the witness as to an interview, which had taken place in August, 1893, by referring to his testimony given in December, 1893; in other words, by the use of testimony given by the witness more than four months after the occurrence. We think it clear that testimony given after this lapse of time was not contemporaneous, and that it would not support a reasonable probability that

the memory of the witness, if impaired at the time of the trial, was not equally so when his testimony on the prior occasion was committed to writing.

In conflict with the well settled rule to which we have just referred, there are some adjudications of the courts of last resort of several States, noted in the margin of this opinion,[1] holding that there exists an exception to the general rule which restricts the right to refresh memory to contemporaneous memoranda or writing. This exception is said to arise when a party is surprised by the unexpectedly adverse testimony of his own witness, in which case he may, for the purpose of refreshing the memory of the witness, be permitted to ask him as to any prior statements, whether oral or written, without reference to their contemporaneousness. The error of this conclusion, as we shall hereafter demonstrate originally arose from a misconception of the doctrine laid down in *Wright* v. *Beckett* or *Melhuish* v. *Collier, infra*, and has been continued by merely following this first departure from correct principles. And this confusion of thought and misunderstanding of those cases seems to have operated upon the mind of the trial court, for it said " it is a thing often done, and when counsel say they are surprised by the way a witness recollects a thing, it is within the discretion of the court to allow counsel to direct the attention of the witness to something which may refresh his recollection." But the right of counsel to refresh the memory of a witness in no way depends on the surprise which may have been created by the testimony of the witness. The right to refresh the memory of a witness, by proper matter, exists independently of surprise. Where a legal instrument for refreshing the memory exists, it may be availed of by the witness himself or may be permitted to be referred to by the court without reference to the course of

---

[1] *Campbell* v. *State*, 23 Alabama, 44; *Hemingway* v. *Garth*, 51 Alabama, 530; *Bullard* v. *Pearsall*, 53 N. Y. 230; *Hurley* v. *State*, 46 Ohio St. 320; *People* v. *Kelly*, 113 N. Y. 647, 651; *Hildreth* v. *Aldrich*, 15 R. I. 163; *State* v. *Sorter*, 52 Kansas, 531; *Humble* v. *Shoemaker*, 70 Iowa, 223; *Hall* v. *Chicago &c. Railroad*, 84 Iowa, 311; *George* v. *Triplett*, (N. Dak.) 63 N. W. Rep. 891.

the examining counsel. Surprise on the part of the examiner of a witness by the latter's unexpected adverse testimony, on direct examination, was among the elements by which it was determined that the right existed to ask a witness as to contradictory statements previously made by him, not for the purpose of refreshing his memory, but with the object of neutralizing or overthrowing his testimony, and this course was only allowed where the right to neutralize or impeach the testimony of one's own witness existed. Indeed, this doctrine of surprise was a part of the controversy as to whether one could be allowed to neutralize or contradict the testimony of his own witness under given conditions which was long agitated, and which culminated in some of the States of the Union and in England in statutory provision on the subject.

A detailed analysis of the cases to which we have above referred will make clear the fact that they rest not upon sound reason, but solely upon the supposed exception to which we have adverted.

In *Wright* v. *Beckett*, 1 Moo. & Rob. 414, it was held by Lord Denman, (Bolland, B., dissenting,) upon a review of previous cases, that where a witness gives evidence destructive of the case which he was called to prove, the party calling him may be permitted, in order to neutralize his testimony, to interrogate the witness as to whether he had not at a previous time given an account of the transaction entirely different from that sworn to by him at the trial, and that the party may also call other witnesses to establish the fact of the making of such prior inconsistent statements.

In *Melhuish* v. *Collier*, 15 Q. B. 878, a witness for the plaintiff, on the trial, having omitted in her testimony to speak of an act of violence committed on the plaintiff by the defendant, was questioned by the plaintiff's counsel, as in cross-examination, and asked whether she had not seen the defendant take the plaintiff by the hair; she denied this, and was then asked whether on an examination before magistrates she had not said to the plaintiff's attorney that she saw it. The witness answered that if she had said so, it was all lies.

She was then asked whether she had not made to the same attorney a further specified statement, and on objection being made the court "ruled that the question might be put, not to discredit, but to remind the witness."

In the course of the argument, at the Queen's Bench, of the motion for a new trial, counsel for defendant urged that it was error to have permitted the question to be put, but Patterson, J., called his attention to the fact that it had only been allowed for the purpose of "reminding" the witness. The counsel evidently understood that the word "remind" was synonymous with a mere caution to the witness, for he said (p. 886):

"A question merely to remind should have had the character of those general admonitions which are sometimes given to a witness to recollect himself and to consider that he is speaking on oath, and which the judge does not take down, or notice to the jury. It ought not, at farthest, to have gone beyond the simple inquiry whether the party had not been examined before. It should, at any rate, have been so shaped that the witness might have admitted the former statement alluded to without discrediting herself."

So, also, the opposing counsel urged that the objection was premature, saying (p. 882): "If counsel had gone on to ask her whether the former statements were not the true ones, it would have been the proper time to object; but the objection would have differed from that now taken."

Patterson, J., found difficulty in coming to a conclusion. (p. 888.)

Coleridge, J., observed (p. 889):

"I agree in the distinction which has been taken between putting a question to the witness as to the former statements, and contradicting his answer. It has been ingeniously suggested by Mr. Smith that, if the question be admissible, it must be so put as to recall the fact to the witness's memory, without tending to impeach his credit if the account he then gives be different from the first: and I can conceive a case in which that might happen. The witness may be flurried on his first examination and afterwards vary his statement when his

attention is recalled to circumstances; but it is said that here the object of the question was distinctly to contradict the witness. It is difficult to draw a line, and I am not disposed to draw it too closely. I think that, in the present case, the question did not go farther than inquiry may properly be carried."

Erle, J., said (p. 890):

"A plaintiff's witness says, in effect, that the plaintiff has no cause of action. Then he is asked whether he has not, formerly, made a different statement. I think that question is proper, and not inconsistent with the rule that a party knowing a witness to be infamous ought not to produce him, and must not be allowed to take the chance of his answers and then bring evidence to contradict him. We do not interfere with that rule. There are treacherous witnesses who will hold out that they can prove facts on one side in a cause, and then, for a bribe or from some other motive, make statements in support of the opposite interest. In such cases, the law undoubtedly ought to permit the party calling the witness to question him as to the former statement, and ascertain, if possible, what induces him to change it."

The judges, moreover, intimated a doubt as to the correctness of Lord Denman's opinion in *Wright* v. *Beckett*, in so far as it recognized the right of a party, when surprised by the testimony of his own witness, to call other witnesses, to prove his contradictory statements, but followed *Wright* v. *Beckett* to the extent that it held that one might, when surprised by the testimony of his witness, ask him as to inconsistent statements, in order to neutralize his testimony, employing, however, the word "remind," in the stead of neutralize. The word "remind," used in *Melhuish* v. *Collier*, in its broadest sense, would, certainly, be susceptible of the interpretation of refreshing memory, and if it were to receive that construction the case would undoubtedly be authority for the proposition that one taken by surprise, by the testimony of his own witness, could refresh the memory of the witness by calling his attention to contradictory statements previously made by him without reference to

whether such statements were or were not contemporaneous, or whether oral or written. But the context of the opinions demonstrates that the case has no such significance. The learned judges were considering not the right of one to refresh the memory of his witnesses, but whether he could neutralize the testimony of his own witness; that is, whether a party had the right to do so as to a witness by him introduced though the incidental effect might be to impeach his credit. The reasoning of the opinion shows that the use of the word " remind " was intended rather as a qualification on the right to neutralize, in case of surprise, which was recognized in *Wright* v. *Beckett*, and, therefore, it was not the purpose of the ruling in the *Melhuish case* to overthrow the elementary rule of evidence which restricts refreshing the memory of a witness to contemporaneous memoranda or writings. And support for the view that the reminding of the witness spoken of in the *Melhuish case* was not considered as synonymous with the right to refresh recollection, is found in the fact that the judge, before whom that case was first tried, subsequently, in 1853, in the case of *Regina* v. *Williams*, 6 Cox C. C. 343, held that where a witness for the prosecution gave a different answer on his examination in chief from that which was expected, his deposition before the coroner or justice, as the case might be, might be put in his hands for the purpose of " refreshing his memory," and then a question from the deposition might be put to him in leading form. The court further said that if the witness persisted in giving the same answer after his memory had been so refreshed, the question might be repeated to him from the deposition in leading form, but when the witness answered that question the counsel could not proceed any further.

A few years after *Melhuish* v. *Collier* was decided, in 1854, Parliament adopted the Common Law Procedure Act, which, among other things, provided as follows :

" A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness shall in the opinion of the

judge prove adverse, contradict him by other evidence, or, by leave of the judge, prove that he has made at other times a statement inconsistent with his present testimony ; but before such last mentioned proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he has made such statement." 17 and 18 Vict. c. 125, § 22.

Clearly the purpose of this statute was to give one a right under certain circumstances to neutralize or discredit the testimony of his own witness, and in no way to change the rule as to refreshing a witness's memory by contemporaneous writings or memoranda. This statute was, substantially, a legislative recognition of the correctness of the rule laid down in *Wright* v. *Beckett,* and the modern English cases have treated the act as applying to the power to contradict and neutralize the testimony of one's own witness when he proves adverse or hostile, and as controlling the examination of the witness himself concerning prior inconsistent statements, as well as the proof thereof by other witnesses. *Faulkner* v. *Brine,* 1 Fost. & Finl. 254 ; *Dear* v. *Knight,* 1 Fost. & Finl. 433.

This view of the act is also the one taken by Taylor in his treatise on Evidence. He refers to the Common Law Procedure Act of 1854, as having settled "the question how far a party is at liberty to discredit his own witness," a question which he says "for years was agitated in Westminster Hall." 2 Taylor Ev. § 1246. Statutes similar to the English act have been passed in various States of the Union, some before and others subsequent thereto. 1 Greenl. Ev. note b to § 444.

The case of *Campbell* v. *State,* 23 Alabama, 44, held that a trial court had not committed error in permitting the State's attorney to inquire of a witness for the prosecution whether he had not, on the day preceding, made statements conflicting with what he had said on the trial, the avowed object of the question being to refresh the witness's memory. The ruling was rested on the authority of *Wright* v. *Beckett, supra,* and on the opinions of Greenleaf and Phillips. But the learned court overlooked the fact that *Wright* v. *Beckett* expressly

confined the right to put the question, in order to neutralize the testimony of the witness when the party introducing him was taken by surprise, and that neither in the treatise of Greenleaf nor that of Phillips is this right to examine a witness for the purpose of neutralizing his testimony confounded or confused with the distinct and different faculty of refreshing the memory of the witness by contemporaneous writings or memoranda. *Hemingway* v. *Garth*, 51 Alabama, 530, was placed simply upon the authority of the previous case.

In *Bullard* v. *Pearsall*, 53 N. Y. 230, upon the trial in the lower court, a witness was called for the purpose of proving that a certain conversation took place between the witness and the defendant previous to the 17th of June, 1868, but to the surprise of the plaintiff the witness testified that the conversation took place on the 24th of July. The date was material. The plaintiff was permitted to ask the witness whether he had not, on a prior examination, sworn that the conversation took place in June, and this action of the trial judge was held to be proper. The Court of Appeals, speaking through Rapallo, J., said (p. 231):

"We are of opinion that such questions may be asked of the witness for the purpose of probing his recollection, recalling to his mind the statements he has previously made, and drawing out an explanation of his apparent inconsistency. This course of examination may result in satisfying the witness that he has fallen into error, and that his original statements were correct, and it is calculated to elicit the truth. It is also proper for the purpose of showing the circumstances which induced the party to call him. Though the answers of the witness may involve him in contradictions calculated to impair his credibility, that is not a sufficient reason for excluding the inquiry."

As authority supporting this language the learned judge said (p. 232):

"The principal cases in this State in which the subject is referred to are: *People* v. *Safford*, 5 Denio, 118; *Thompson* v. *Blanchard*, 4 Comst. 311; *Sanchez* v. *People*, 22 N. Y. 147; and in England it is very thoroughly discussed in *Melhuish*

v. *Collier*, 15 Q. B. 878. It has since been there regulated by act of Parliament, passed in 1854. The English and American authorities are referred to in 1 Greenl. Ev. sections 442, 444, 444*a* and notes."

The fact that *Melhuish* v. *Collier* does not sustain the proposition which it is thus cited to support we have already established, and even a casual examination of the New York cases referred to demonstrates that they not only do not uphold the views expressed, but, on the contrary, are adverse to them. The only remaining reference is to sections 442, 444 and 444*a* of Greenleaf on Evidence. One of these sections (444) which we have already quoted, bears no relation to the subject. The other, 442, does not refer to refreshing recollection, but treats of the question whether one may contradict his own witness. The third section referred to, 444*a*, is not a part of the treatise of Greenleaf. The learned judge of course referred to the twelfth, or Redfield's, edition of Greenleaf's work, published in 1866, where the comments of the editor are included in the text, in brackets, and by way of supplemental sections. In this edition there is such a section, 444*a*:

"[The author seems in the preceding section to have stated the doctrine of the right of a party to contradict his own witness who unexpectedly testifies against him, somewhat more strongly than is held by the English courts; and the rule of the American courts is even more restricted than that of the English courts in that respect. The question is extensively discussed in the case of *Melhuish* v. *Collier*, 15 Q. B. 878, both by counsel and by the different members of the court, and the conclusion arrived at is, that you may cross-examine your own witness if he testify contrary to what you had a right to expect, as to what he had stated in regard to the matter on former occasions, either in court or otherwise, and thus refresh the memory of the witness and give him full opportunity to set the matter right if he will, and at all events to set yourself right before the jury. But you cannot do this for the mere purpose of discrediting the witness, nor can you be allowed to prove the contradictory statements

of the witness upon other occasions, but must be restricted to proving the fact otherwise by other evidence. And the same rule prevails in the courts of admiralty. *The Lochlibo,* 14 Jur. 792; 1 Eng. L. & Eq. 645.] "

This language, however, as we have seen, is not the opinion of Greenleaf, but the comment of his editor Redfield, and was doubtless influenced by the same mistaken view of what was really decided in *Melhuish* v. *Collier*, to which we have already adverted.

Brevity prevents a detailed review of the other cases on this subject previously mentioned in the margin hereof. Suffice it to say that an examination discloses that they all rest upon the mistaken idea which we have pointed out. Indeed, if the principles upon which these cases necessarily rest are pushed to their logical conclusion, they not only under the guise of an exception overthrow the general rule as to refreshing memory, but also subvert the elementary principles of judicial evidence. The fact that these consequences are the legitimate and necessary outcome of the cases we have reviewed, depends not on mere abstract reasoning, but is demonstrated by the case of *People* v. *Kelly*, 113 N. Y. 647, 651 (1889). In that case, upon the sole authority of *Bullard* v. *Pearsall*, it was held that where inconsistent or adverse statements had not been given by a witness for the State, but, from mere forgetfulness or a wish to befriend the accused, the witness had omitted to testify to certain details, error had not been committed by the court in allowing the prosecuting attorney, for the purpose of refreshing the recollection of the witness, to inquire of him whether he had not testified to the omitted facts before the committing magistrate and grand jury, and, upon his admission that he had done so, to ask if the statements theretofore made were not true, and that the affirmative reply of the witness was competent evidence to submit to the jury. Not only the error but the grave consequences to result from such a doctrine were aptly pointed out by Chief Justice Shaw in *Commonwealth* v. *Phelps*, 11 Gray, 73, where an attempt was made to refresh the memory of a witness by reference to testimony before

a grand jury not contemporaneously given.  The Chief Justice said:

"It is not a regular mode of assisting the recollection of a witness to recur to his recollection of his testimony before the grand jury.  If it was not true then, it is not true now; if it was true then, it is true now, and can be testified to as a fact.  Of what importance is the fact that he had a memorandum to aid him in testifying before the grand jury?  To ask what he testified to before the grand jury has no tendency to refresh his memory.  The fact of his having testified to it then is not testimony now.  It is an attempt to substitute former for present testimony."

Equally lucid and cogent are the expressions of the Supreme Court of Pennsylvania in *Velott* v. *Lewis*, 102 Penn. St. 326, where, in holding that the memory of a witness could not be refreshed by reading to him notes of testimony given by him in a former trial of the same cause, the court said (p. 333): If the fact that "a witness failed to recollect what he had previously sworn to were enough to admit the notes of a former trial, we might as well abandon original testimony altogether, and supply it with previous notes and depositions."  "It would certainly be an excellent way to avoid the contradiction of a doubtful witness, for he could always be thus led to the exact words of his former evidence.  As we are not yet prepared for an advance of this kind, we must accept the ruling of the court below as correct."

In leaving this branch of the case it is well to say that *Hickory* v. *United States*, 151 U. S. 303, referred to by the Supreme Court of North Dakota in *George* v. *Triplett*, 63 N. W. Rep. 891, as sustaining the exception to the general rule there announced, does not warrant the assumption. *Hickory* v. *United States* concerned merely the question of the right of a party, after proper foundation had been laid, to contradict his own witness, and in no way involved the right to refresh the memory without reference to the contemporaneousness of the statements, or whether they were oral or written.

Our conclusion, therefore, is that the exception to the action of the court in allowing the use made of the minutes of the grand jury was well taken, and that there was prejudicial error in this particular. Its existence, however, relates to and affects only the conviction under the second count of the indictment.

3. *Defendant's ownership of stock in the bank.*

The tenth assignment alleged error in sustaining an objection to a question propounded by counsel for the defendant upon the cross-examination of a witness for the prosecution. The witness (Charles E. Byington) had testified, on direct examination, that the defendant had turned over to the bank bonds of the par value of thirty-five thousand dollars, and that the defendant had a paramount interest in the companies which had issued such bonds. On cross-examination, the witness stated that the accused held, on his own account, a large amount of the stock of the companies referred to, was buying and selling, and had on hand more or less of said securities. The counsel for the accused then asked the following question :

" Q. What percentage of the stock of the National Granite State Bank of Exeter did Mr. Putnam own during the first six months of 1893 ? "

On objection being made by the government, counsel stated that his purpose was to show the relations of the accused to the bank and his ownership of the stock, and that the proposed evidence was pertinent as bearing upon the intent of the defendant with reference to the purchasing of securities for the bank, and in dealing with the bank's funds ; and that it made a difference whether he owned all of the stock or did not own any of it. The court ruled that the government had not " opened up affirmatively the ownership of the stock," and that the proposed evidence was not proper crossexamination.

As the order in which evidence shall be produced is within the discretion of the trial court, and as the matter sought to be elicited on the cross-examination for the accused was not offered by him at any subsequent stage of the trial, it is mani-

708 OCTOBER TERM, 1895.

Opinion of the Court.

fest that no prejudicial error was committed by the ruling complained of.

. 4. *Jurisdiction of the court over the seventh count.*

The twelfth and seventeenth assignments of error result from an exception taken to the refusal of the court to grant defendant's request, made at the close of the testimony, for a peremptory instruction in his favor, as to the seventh count. This request was based on the assumption that all the acts relied on, to convict, under that count, and which were enumerated in the bill of particulars, took place in Massachusetts, and hence were beyond the jurisdiction of the court. A like question also arises from an exception taken to the charge of the court on the same subject. We will consider first the exception taken to the charge of the court, since if it erroneously applied the law to the facts it must lead to reversal, although the court may have rightly refused the peremptory instruction.

As heretofore stated, this count charged the unlawful abstraction and conversion to his own use by the defendant at Exeter, New Hampshire, of "monies, funds and credits of the property of said association," (the National Granite State Bank, etc.,) "a more particular description of which monies, funds and credits is to the said jurors unknown;" and that the district attorney furnished to the counsel for the defendant a bill of particulars covering fifteen checks.

In considering these assignments it is at the outset clear that, although the commission of the offence charged may have been begun in Massachusetts, if it was completed in New Hampshire the court had jurisdiction, under Rev. Stat. § 731, which provides: "That when any offence against the United States is begun in one judicial district and completed in another, it should be deemed to have been committed in either, and may be dealt with, inquired of, tried, determined and punished in either district in the same manner as if it had been actually and wholly committed therein."

We summarize the facts, which are stated at length in the bill of exceptions, as follows: The National Granite State Bank of Exeter kept an account with the National Bank of

Redemption of Boston, which was a reserve agent. From time to time deposits were made by the bank of Exeter with the Boston bank, and were placed to the credit of this account, and checks were drawn by the bank of Exeter on the Boston bank, and when paid by the latter were debited to the account. The checks mentioned in the bill of particulars were all drawn by the accused, as president of the National Granite State Bank of Exeter, on the Boston bank. Two of these checks were drawn respectively on January 17 and 23, and were for $5000 each. These checks were both drawn and dated in Boston; were made payable to the American Loan and Trust Company there, which company gave to the accused, as consideration for them, its drafts on Winslow, Lanier & Co., of New York, which drafts were paid to the accused or his assigns, and the proceeds in no way enured to the benefit of the Exeter bank. The American Loan and Trust Company, the payee of the checks, collected them in Boston, and the sum of the checks thus paid out by the Boston bank was by it debited to the account of the Exeter bank. The other checks referred to in the bill of particulars were also drawn by the accused, as president of the Exeter bank, on the Boston bank, between the 1st day of April and the 6th day of May, 1893, and they were delivered in Boston to the payees thereof for a valuable consideration, which also in no way enured to the Exeter bank, and were paid, and the amount was also debited to the account of the Exeter bank. At the time these checks were drawn, and when they were presented to and paid by the Boston bank and debited by it, there was a credit to the account of the bank of Exeter adequate to meet the checks, so that the effect of debiting them was not to overdraw the account of the Exeter bank. The bill of exceptions moreover recites that:

" Evidence was admitted, subject to defendant's exception, tending to show that at a meeting of the directors of the bank at Exeter, held about one year prior to the alleged unlawful drawing of checks by the defendant at Boston, a vote had been passed by the board of directors that no one but the cashier should thereafter have authority to draw checks

against the account with the reserve agent; that the defendant was present at that meeting and acted as clerk of the board.

"Such a vote was never recorded in the directors' record, and the reserve agent was never notified of it."

There was also testimony tending to show that the Boston and Exeter banks twice a month adjusted their running account by means of statements which are called in the record "reconciliation sheets." When these reconciliation sheets came to the Exeter bank in February they were accompanied with vouchers, among which were the two cancelled checks for $5000, each drawn in January, and which had been paid and debited, as above stated. The evidence also tended to show that the bank at Exeter owed to the American Loan and Trust Company a note or notes amounting to $10,000. When the cashier of the Exeter bank discovered the debit of the two January checks on the reconciliation sheets and observed these checks among the vouchers returned by the Boston bank, he asked the president (the accused) for what purpose he had drawn the checks, and the president answered they had been drawn in order to pay the note or notes of the Exeter bank held by the American Loan and Trust Company. Thereupon the cashier entered on the books of the bank at Exeter the payment of the note or notes held by the American Loan and Trust Company, and settled the reconciliation sheets with the Boston bank, and accordingly credited the account of the Boston bank with the sum of the two January checks. There was also testimony tending to show that neither the cashier or directors (except the accused) knew anything of the checks drawn in January until the receipt of the February reconciliation sheets, and that they also knew nothing of the April and May checks until the reconciliation sheets for May, with their accompanying vouchers, were received. The evidence also tended to show that when the payment of these last checks by the Boston bank was discovered, the defendant was asked for an explanation. He first refused to give information, then evaded doing so, until about the 24th of May, when he stated to the directors

of the Exeter bank that the checks had been used in order
" to put money into the Leavenworth Electric Railway Com-
pany and the Hydraulic Company."

On the face of the foregoing facts it is evident that the
alleged criminal acts arising from the two January checks
were begun in Massachusetts. The question is, were such
acts there completed or did the final fact, which was essen-
tial to effectually absorb the credit of the Exeter bank with
the Boston bank, take place in New Hampshire? The rela-
tion between the banks was that of debtor and creditor. The
checks having been drawn, collected and debited in Boston,
constituted a concluded transaction, if there was authority to
draw them. On the contrary, if there was no authority, the
mere fact that they were debited to the account of the
Exeter bank did not absorb the credit of that bank, as only
a lawful and authorized check could have justified the debit.
Of course, no ratification was essential to cause the checks to
successfully obtain the money of the Boston bank, for such
obtaining was consummated and concluded by the fact of
paying out the same on. the checks. But we are here con-
cerned not with whether the checks obtained the money of
the Boston bank, but with whether such checks absorbed the
credit of the Exeter bank, which fact was distinct and sepa-
rate from the question of payment, and depended on whether
the debit made in consequence of the payment of the checks
lawfully absorbed the credit of the Exeter bank. If, then,
the checks were unauthorized and the illegal debit which was
made as the result of their payment was ratified and made
binding in New Hampshire by the Exeter bank, it is clear
that the act which consummated the taking of the credit of
the Exeter bank was completed in New Hampshire, and was
therefore within the jurisdiction of the court. Such was the
view taken by the court in its charge to the jury, as follows:

" Mr. Branch, representing the government, says the whole
transaction in Boston, so far as the drawing of the checks
and the receiving of the money was concerned, was fraudulent.
He argues that the bank at a meeting had adopted a resolu-
tion, providing that the president should not draw checks,

and that, therefore, the president had no authority, and the president knew he had no authority, to draw checks. This becomes material if you find it was so, because if he had the authority to draw checks and did withdraw the funds, although he may have done it for the purpose of misappropriating and abstracting the money, if he had authority to draw those checks, it would become a past and completed act in Massachusetts as you will see ; but, if he did not have authority, if he was acting outside of his authority, and acting fraudulently, while the drawing of the checks was effectual in withdrawing the funds from the Bank of Redemption in Boston, it would not withdraw and abstract the credit of the bank in Exeter, existing in its behalf in the Bank of Redemption in Boston, because notwithstanding his drawing the checks, if he had no authority to draw them, the Exeter bank would still be in position to enforce its rights and receive the benefits of its credit which had been improperly and unlawfully interfered with by some unauthorized act in Boston, and while the money had gone and been misapplied the credit of the Exeter bank would be the same substantially and might be enforced. . . . So, in order to give jurisdiction here and enable you to pass upon this question, you must find that the offence was partly committed in Massachusetts, which it is conceded was so, if there was any offence, and partly here, that is, in order to give this court jurisdiction, in order to make this offence completed partly in Massachusetts and partly here, you must find that he conceived the plan, not only of abstracting the moneys by means of the checks, but of making the transaction complete and effectual by withdrawing the credit existing in behalf of the Exeter bank: So if he came into New Hampshire, and through artful deception and fraudulent misrepresentation, with the intent of making the abstraction begun in Massachusetts complete, induced the officers of the bank to surrender that credit, then he is guilty under this charge which alleges that he wilfully and unlawfully abstracted moneys, funds and credits of the Exeter bank."

Having determined the correctness of this instruction, it

remains only to ascertain whether the proof sustained the court in leaving to the jury the ascertainment of the facts contemplated in the charge, that is to say, whether the court rightly refused the peremptory request, made by the defendant, to direct a verdict in his favor. There can be no doubt that the president of a national bank, *virtute officii*, has not necessarily the power to draw checks against the account kept with another bank by the bank of which he is president. Indeed, the statutes expressly provide that the powers of the president of a national bank may be defined by the board of directors. Rev. Stat. § 5136. True it is, that by a course of dealing with a particular person, the power of an officer to perform a particular act may be implied when such power is not inconsistent with law. *Merchants' Bank* v. *State Bank*, 10 Wall. 604. Now, here there was an entire absence of all proof as to a course of business implying authority on behalf of the president to draw checks in the name of the bank. In view of the fact that the power to draw the check did not inhere in the functions of the president, and in consequence of the absence of proof as to a course of business implying the power, as also in consideration of the fact that the January checks were not drawn at the banking establishment, but in another city, we think the proof was adequate to justify the court in refusing to take the case from the jury, and in leaving it to them to determine whether there was such infirmity in the checks as made a subsequent ratification, obtained in New Hampshire by the fraudulent representation of the defendant, one of the efficient causes for the absorption of the credit resulting from the debit of the checks. Apart from this view, which was covered by the charge of the court, there were other considerations which rendered it equally improper to take the case from the jury. It cannot be denied that if when the January checks were called to the attention of the bank at Exeter, the authority of the president to draw them had been repudiated, and if such denial had been communicated to the Boston bank the ability of the president of the Exeter bank to have obtained payment of the subsequent checks would not have existed. As the failure of the Exeter

bank to repudiate the January checks, and in so doing give notice to the Boston bank, may have been consequent upon the fraudulent misrepresentation as to the purpose for which the January checks were drawn, it was competent for the jury to consider the relation which this fact bore to the drawing of the subsequent checks. In other words, the condition of evidence was such that the misrepresentation made in New Hampshire as to the reason for the drawing of the January checks, in connection with all the other evidence, was competent to go to the jury as tending to show not only the completion in New Hampshire of the wrongful obtaining of the credit, commenced by the drawing and debiting, in Boston, of the January checks, but also the initiation in New Hampshire of the wrongful obtaining of the credit completed subsequently in Massachusetts by the drawing of the April and May checks; if the jury thought from all the evidence that when the misstatements were made as to the January checks the purpose was to further defraud by drawing the subsequent checks.

The foregoing considerations dispose of all the questions presented, and the conclusion which results from them is, that there is error in the conviction as to the second count, and none as to that under the seventh count. The sentence imposed in consequence of the verdict of guilty on both counts was distinct and separate as to each count, and was made only concurrent. It follows, therefore, that if the verdict and sentence, as to the second count, be set aside, nevertheless the entire amount of punishment imposed will be undergone. Under these circumstances, it is doubtful whether the error committed, as to the second count, should be treated as prejudicial, since the only effect of reversing and ordering a new trial, as to this count, will be to leave the full term of the existing sentence in force and to submit the accused to another trial on the second count, from which trial, if convicted, an additional sentence may result. Considering this situation, we deem that

*The ends of justice will best be subserved by affirming the judgment and sentence under the seventh count, and by*

*reversing the judgment as to the second count, and remanding the case to the court below for such proceedings with reference to that count as may be in conformity to law, and it is so ordered.*

The CHIEF JUSTICE dissenting: MR. JUSTICE BREWER, MR. JUSTICE BROWN and myself think the conviction on the second count ought to stand.   In our opinion the discretion of the Circuit Court was properly exercised in allowing leading questions to be put to the witness Dorr, and they amounted to nothing more than enabling him to overcome temporary forgetfulness by reference to what he had said on a prior examination.