**Warfield Milo GOINGS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18520.**

United States Court of Appeals Eighth Circuit.

April 24, 1967.

Thomas H. Foye, of Bangs, McCullen, Butler & Foye, Rapid City, S. D., for appellant and filed typewritten brief.

Harold C. Doyle, U. S. Atty., Sioux Falls, S. D., for appellee. Ronald E. Clabaugh, Asst. U. S. Atty., Sioux Falls, S. D., was with him on the brief.

Before MATTHES, LAY and HEANEY, Circuit Judges.

LAY, Circuit Judge.

In August 1964 Warfield Milo Goings, then 19 years of age, along with companions Ramona Two Two, a child of 15, Delbert Wayne Ghost Bear, then 21, Albert Whiting, Jr., then 22, and Lester Duane Sierra, Jr., a youth of 16, lived on a government Indian Reservation in Pine Ridge, South Dakota. All of the above became involved in a drinking spree during a three-day period resulting in break-ins of a cafe, drive-in, and a filing station in Pine Ridge, netting the group some potato chips, potato salad, pop, candy bars, a bubble gum machine, some cigarettes and, at the filling station, six guns and approximately twelve dollars in cash. The evidence is clear that during this spree the defendant performed the merciless act of shooting a watchdog at the drive-in. This lawless experience brought criminal indictments under federal law for burglary, based up-

on Tit. 18, U.S.C. § 1153 where " * * * the offense of burglary shall be defined and punished in accordance with the laws of the State in which such offense was committed." [1]

Ramona, Lester Duane, Albert, and Delbert all pleaded guilty to the charges. All were placed on probation with the exception of Lester, who was sentenced to the Federal Correction Institution at Englewood, Colorado.

Warfield Goings pleaded not guilty and through appointed counsel requested a jury trial. Upon a jury verdict of guilty on three counts of an indictment, the district court sentenced him to the penitentiary for consecutive terms of three years on each count, or a total of nine years.[1(a)] Defendant brings this in forma pauperis appeal claiming two grounds for reversal: first, that the court erred in his instructions on the defense of intoxication, and secondly, that prejudicial error occurred by reason of improper interrogation of the government witnesses.

We find no merit in the first ground, but reverse and remand the proceedings for a new trial on the latter contention.

[1]. In 1964, South Dakota Statutes, § 13.-3703 provided:

"*Burglary in third degree, defined.* A person committing any of the following specifed acts is guilty of burglary in the third degree.

\* \* \* \* \*

"(2) Breaking or entering at any time any building within the curtilage of a dwelling house but not forming a part thereof, or any building or part of any building, booth, tent, railroad car, vessel, or other structure or erection in which any property is kept, with intent to commit larceny or any felony." S.D.C.1960 Supp.

Also within the laws of South Dakota was § 13.0504, which read:

"*Intoxication; effect as a defense.* No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any

particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act." S.D.C.1939.

[1.(a)] Appellant's chances for a useful role in society have already become delayed, mostly because of his unfortunate environment as a youth. A sad commentary on 20th Century society and habitation on a federal Indian Reservation is found in the life of this American Indian youth, reflected in his description of family life, largely spent with his brother and companions "sniffing glue" or "gasoline" and "getting drunk." The record does not affirmatively show the basis for the gross disparity in sentences imposed upon the offending parties. Although imprisonment for three years on each count seems severe, in view of the facts and circumstances, the fact remains that the sentences are within the maximum authorized by statute.

The defendant testified that he was "drunk" throughout an eight day period of time, including August 20 to August 22 [2], and could not remember any events that took place.

■ Defendant argues that he did not have the requisite intent to commit the burglaries. Intoxication is not a defense in South Dakota, but sufficient evidence of it could vitiate the specific intent required to commit certain crimes. The trial court submitted this defense in the following language:

"You are also instructed that as you ponder the question of guilt or innocence of this defendant, you must keep in mind that intoxication under the law is not a defense, unless from the record as a whole on that question there is enough to create a reasonable doubt as to whether or not he was sober enough to form the required intent to commit the crime charged."

■ Defendant claims that the same is misleading in that it could be construed that the defendant had the burden of proof in showing "reasonable doubt." Defendant did not make specific exception to the instruction on this ground. Nevertheless we feel, when read with all other instructions, it is not misleading as to burden of proof. Secondly, it is argued that the instruction does not unequivocally state that defendant is entitled to an acquittal under circumstances where he does not have the intent. It would appear the court was generally instructing in conformance with the South Dakota statute. State v. Kapelino, 20 S.D. 591, 108 N.W. 335. See also People v. Odell, 1 Dak. 197, 46 N.W. 601 and State v. Ford, 16 S.D. 228, 92 N.W. 18. This was permissible and although not as specific as defendant's request or as other approved instructions [3] in this area, we think it meets the minimum standards of the law and is not error.

We now come to the government's examination of Delbert Wayne Ghost Bear.[4] He was on probation by reason of the events of August 20–22, 1964 and was called to testify on behalf of the government. The witness was asked and he answered these questions:

"Q. Now, during August of 1964, where were you?

"A. I can't remember too well.

"Q. To refresh your memory, were you at Pine Ridge?

"A. Yes, sir.

---

2. Nor are we impressed with the government's argument that the defendant's recollection was that the drinking spree started the night after the August 20th break-in. All other evidence reflects that the drinking took place contemporaneous with the first break-in and as the defendant said he usually was "drunk."

3. A more plenary, and perhaps more satisfactory, instruction is found in Mathes and Devitt, Federal Jury Practice and Instructions, p. 139:
 "§ 10.16 Voluntary Intoxication
 "Although intoxication or drunkenness alone is not a defense, the fact that a person may have been intoxicated at the time of the commission of a crime may negative the existence of specific intent.
 "So, evidence that a defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the defendant acted, or failed to act, with specific intent, as charged.

"If the jury has a reasonable doubt from the evidence in the case whether, because of the degree of his intoxication, the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should acquit the accused."
Citing, Hopt v. People, 104 U.S. 631, 26 L.Ed. 873 (1881); Tucker v. United States, 151 U.S. 164, 170, 14 S.Ct. 299, 301, 38 L.Ed. 112 (1893); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943, 946 (1958); Allen v. United States, 239 F.2d 172, 173 (6th Cir. 1957); Proctor v. United States, 85 U.S.App. D.C. 341, 177 F.2d 656, 657 (1949); Edwards v. United States, 84 U.S.App.D.C. 310, 172 F.2d 884 (1949).

4. Error is similarly raised as to the improper use of Ramona Two Two's statement. However, this occurred through a single question and answer and although erroneous, it could hardly by itself constitute prejudice sufficient to reverse.

"Q. Now on Thursday evening of August 20, 1964, where were you?

"A. I can't remember.

"Q. Well, to refresh your recollection did you, previous to coming to court here, give a statement to Mr. Moore, Criminal Investigator, and also Mr. McCarty, Special Agent of the F.B.I.? * * *

"Q. Do you remember giving them a statement?

"A. Yes, sir.

"Q. And before coming into court, Delbert, weren't you furnished a copy of that statement to re-read?

"A. Yes, sir.

"Q. And did you re-read it?

"A. I forgot to read it.

"Q. Didn't I ask you whether or not you had looked it over, and didn't you say you had?

"A. I said I forgot to read it.

"Q. Can you read?

"A. Not very good. * * *"

The witness stated he had a twelfth grade education. The government then, out of the presence of the jury, claimed "surprise" and moved to have the court declare the witness "hostile" on the grounds that the witness had told the government he had read the statement before coming to court and inferred that since talking to the defendant the witness had conveniently lost his memory. The court thereupon declared that the witness was "hostile" and ruled:

"This is not impeachment, this is statements elicited by reason of the fact that he is hostile—a hostile witness. * * * *I think it's substantive evidence because he refuses to testify,* and he is a hostile witness, and for that reason, as to any statements he made in there, you can ask leading questions." (The defendant objected to the examination on the ground that it was improper impeachment and that the statement was not made under oath, not subject to cross examination.) (Our emphasis) [5]

Thereafter, each sentence of the statement was read to the witness and asked if that was a correct statement. Because of the significance we have set out in the Appendix the text of that portion of Ghost Bear's examination.

In addition, the trial court instructed the jury as to his testimony as follows:

"The Court, after hearing certain preliminary testimony of one Delbert Wayne Ghost Bear and in conjunction therewith a statement from the witness that he 'couldn't read so good', even as he admitted being a high school graduate, held him to be a hostile witness, and leading questions by the prosecution for that reason permitted. This testimony is to be treated as a part of the affirmative proof by the government, but you are instructed that it, as well as all other testimony, is to be scanned against the background of credibility heretofore submitted."

Exception was taken to this instruction on the ground that it allowed the jury to consider the statement as substantive evidence.

As indicated, the trial court did not consider Ghost Bear's statement as impeachment. Even assuming a witness's inability to remember can be specifically contradicted by ex parte statements (compare, Troublefield v. United States, D.C.Cir., decided December 12, 1966, 372 F.2d 912), the government did not attempt to pursue any further foundation for impeachment. The only question asked, "Where were you on the night of August 20, 1964?" and the an-

---

5. Although lacking in specificity, we consider defendant's objection (particularly in view of the court's ruling) sufficient to attack the improper manner which the government used to refresh the recollection of the witness. Compare Cox v. United States, 8 Cir., 284 F.2d 704, at

709. See also Troublefield v. United States, D.C. Cir., decided December 12, 1966, 372 F.2d 912, where defendant's counsel "consciously failed" to object to the reading of a witness's statement as a trial strategem.

swer, "I can't remember," can not provide foundation to impeach with the statement relating details of events occurring that evening as well as August 21 and August 22. But the overwhelming weight of authority holds that impeachment of one's own witness must be established on the predicate of both "surprise" and "damage." [6]

In Randazzo v. United States, 8 Cir., 300 F. 794, at 797–798, this court stated:

"* * * In its simplest statement it is that, when a party calls a witness and is surprised by affirmative evidence given by the witness, which actually aids the adversary party, the party calling the witness may cross-examine him, and show statements made by him which are contrary to the testimony given by him on the witness stand. * * * But when the witness merely fails, when called, to testify in favor of the party calling him, as he was expected to do, but says nothing which tends to aid the case of the adversary party, he cannot be cross-examined or impeached by the party who calls him. * * *

"The situation as to the witness Ray is somewhat different on the facts.

This witness, when on the stand, failed to testify as counsel for the government confidently expected he would. As the basis for this expectation, the government relied on an alleged statement made by the witness, to the assistant district attorney, which, it was intimated, was had in a conversation with counsel for the government and later embodied in an affidavit. But Ray gave no evidence in any way helpful to the defendants, nor did he aid the case of the government. In short, his testimony was wholly colorless and negative in probative effect. In such case, any showing of any former statements of the witness, in which he said things hurtful to defendants was inadmissible."

See also Kuhn v. United States, 9 Cir., 24 F.2d 910, 913; Mitchell v. Swift & Co., 5 Cir., 151 F.2d 770; Bushaw v. United States, 9 Cir., 353 F.2d 477, at 481.[7]

▮ However, in conjunction with the court's ruling the government sought specifically to utilize the statement not as impeaching evidence but through leading questions to refresh the witness's recollection with it. Refreshing a wit-

---

6. See 3 Wigmore, §§ 904, 1043 (3rd ed.).

7. This subject was early discussed in the oft-cited case of Crago v. State, 28 Wyo. 215, 202 P. 1099 (1922) :

"Such statements, when shown either by the witness himself or by other proof, can, as before pointed out, only be used and regarded as neutralizing and counteracting the effect of the evidence given by the witness on the witness stand, so as to make that evidence as near as possible as though it had never been given. That being its only function, there must, in order to permit them to be shown, be some prior evidence to neutralize. Where a witness states no evidence against the party calling him, or where he gives only favorable testimony, there is nothing to counteract. The testimony to be neutralized must therefore be prejudicial, detrimental; otherwise the previous statements shown would stand out before the jury, not as offsetting some proof already given, but as substantive evidence of a fact, and to permit this to be done would be to turn to a dangerous purpose * * *.

"When the witness Carney in the case at bar stated that he did not remember that the defendant made an admission of the crime on the next morning, he stated no fact prejudicial or detrimental to the state; he simply failed to prove a fact which the state wanted to show. The failure to so remember was no evidence to be neutralized; after attempted neutralization, that is, after the statements were shown, the case would in legal effect stand the same as it was before, namely that he did not remember. Hence the only purpose that could be subserved by reading into the record the previous statements made, and the only effect that this could have, would be to cause these statements, which were hearsay, to appear to the jury as substantive evidence, the highly prejudicial effect of which is clear. It was therefore error. * * *"

ness's recollection by memorandum or prior testimony is perfectly proper trial procedure and control of the same lies largely in the trial court's discretion. However, if a party can offer a previously given statement to substitute for a witness's testimony under the guise of "refreshing recollection," the whole adversary system of trial must be revised.[8] *The evil of this practice hardly merits discussion. The evil is no less when an attorney can read the statement in the presence of the jury and thereby substitute his spoken word for the written document.* See United States v. Block, 2 Cir., 88 F.2d 618. "* * * the contents of the statements are not to be put in evidence before the jury." Young v. United States, 94 U.S.App.D.C. 62, 214 F.2d 232, at 238.

In Rosenthal v. United States, 8 Cir., 248 F. 684 at 686, this court said:

"Another error committed was the admission of the testimony of Lipschitz, the main witness for the government, without whose testimony there was practically no evidence to justify a verdict of guilty. While, in view of his testimony, as given before the referee, *it was proper to permit him to be examined as a hostile witness, and as one whose testimony at the trial was a surprise to the government, it was improper to read to him all of his testimony before the referee,* by way of cross-examination, and ask him as every question and answer was read before the jury, 'Did you not on the former occasion testify as follows?' *This was not for the purpose of refreshing his memory, but was in fact introducing his testimony,* in an examination before the referee under section 21 of the Bankruptcy Act (Comp.St.1916, § 9605). This was error. Commonwealth v. Jeffs, 132 Mass. 5; Chamberlayne on the Modern Law of Ev. § 3507." (Our emphasis.)

See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, at 234, 60 S.Ct. 811, at 849, 84 L.Ed. 1129, where the court said:

"* * * there would be error where under the pretext of refreshing a witness' recollection, the prior testimony was introduced as evidence."

Cf. National Dairy Products Corp. v. United States, 8 Cir., 350 F.2d 321.

Proper foundation requires the witness's recollection to be exhausted, and that the time, place and person to whom the statement was given be identified. When the court is satisfied that the memorandum on its face reflects the witness's statement or one the witness acknowledges, and in his discretion the court is further satisfied that it may be of help in refreshing the person's memory,[9] the witness should be allowed to refer to the document.[10] It then becomes

---

**8.** The use of an exhibit as "past recollection recorded" where the witness swears that his written recital of facts is true, is not to be confused. Justification for the admissibility of such an exhibit is safeguarded by the requirements that (1) the witness acknowledge the document as accurate, and (2) that it be prepared "contemporaneously" with the events. See McCormick, Evidence, § 9, p. 15 (1954); 3 Wigmore §§ 734, 755 (3rd ed.) See Papalia v. United States, 5 Cir., 243 F.2d 437.

**9.** United States v. Socony-Vacuum Oil Co., supra, finds no restriction in the early decision of Putnam v. United States, 162 U.S. 687, 16 S.Ct. 923, 40 L.Ed. 1118 (criticized by 3 Wigmore § 761) as to the requirement that the earlier testimony or statement must be "contemporaneous" to the event, in order to allow the witness's memory to be refreshed. The *Socony* decision gives us the modern concept that the document should be "[m]easured by the test of whether or not the prior statement made under oath was reasonably calculated to revive the witness's present recollection * * *." 310 U.S. at 236, 60 S.Ct. at 850.

**10.** See excellent discussion of rule in the instructive opinion of Judge Kalodner in United States v. Riccardi, 3 Cir., 174 F. 2d 883.

This is the exact and proper procedure the government pursued (evidently with-

proper to have the witness, if it is a fact, to say that his memory is refreshed and, independent of the exhibit, testify what *his present recollection is*. United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 232, 60 S.Ct. 811.[11] But to read the statement aloud for refreshing recollection to the witness, hostile or not, is patent error.

■ The trial court ruled that the witness was hostile and therefore the statement may be admitted as substantive evidence. Hostility of an *adverse witness* may allow the use of leading questions to refresh recollection or to contradict the "surprise" testimony. We know of no rule of law where hostility of a witness transforms hearsay statements of the witness into admissible substantive proof. The trial court may have confused the rule concerning the examination of *adverse parties* under Rule 43(b), which necessarily allows cross examination of adverse parties as distinguished from adverse witnesses to seek admissions. See discussion of this distinction in Degelos v. Fidelity & Casualty Co. of New York, 5 Cir., 313 F.2d 809, 814–815. See also Ellis v. United States, 8 Cir., 138 F.2d 612, at 617, and Judge Gibson's recent discussion of Rule 43(b)` in Skogen v. Dow Chemical, 8 Cir., decided March 30, 1967, 375 F.2d 692.

■ Appellee urges, however, that the witness Ghost Bear affirmed that the statements were correct and therefore were adopted by the witness. We view this argument with extreme difficulty because of the witness's expressed uncertainty (see Appendix) in responding to questions on both his direct and cross examination. However, even if the witness adopts the prior statement as true, the error is not cured. It is still a hearsay statement suggested to the witness rather than his own statement given under oath in court. The procedure utilized cannot be sanctioned

---

out success) with the witness Lester Sierra:

"Q. Where was Warfield Milo Goings?

"A. I don't know. * * *

"Q. Well, Lester, did you look at a statement that you had given before testifying in order to refresh your recollection of what happened?

"A. Yes.

"Q. And if I hand you the statement, would it help you to refresh your memory as to just what happened at the drive-in?

"A. Yes.

"Q. I will show you what has been marked Ex. No. 9 and ask you if you haven't read that in the last few days or so?

"A. (Witness reads the statement). Yes.

"Q. You did read it?

"A. Yes.

"Q. Does it help refresh your memory?

"A. Yes.

"Q. Calling your attention to the large paragraph in the middle, would you again look at it and after looking at it can you tell me, in addition to yourself, who went inside the drive-in?

"Mr. Foye: That's objected to, Your Honor, it's an attempt to impeach his own witness.

"Mr. Doyle: I am just refreshing his memory, Your Honor.

"The Court: Overruled.

"A. Albert Whiting."

11. The trial court in many instances should liberally allow a witness to refer to records, accounting sheets and reports in testifying. Generally, doctors, engineers, accountants and other lay witnesses testifying should be allowed continuously to refer to data on their reports, etc. See Title Guaranty & Surety Co. v. State of Missouri, ex rel. and to Use of Stormfeltz, 8 Cir., 105 F.2d 496; Christianson v. United States, 8 Cir., 226 F.2d 646; see also 3 Wigmore § 787 (3rd ed.) encouraging "flexible liberty" allowing experts to read their reports. However, the trial court should exercise caution to assure that the memorandum is not a written summary made specifically for use in court. It cannot be a mere subterfuge for suggestion. See N.L.R.B. v. Federal Dairy Co., 1 Cir., 297 F.2d 487. Nevertheless, when statements are given to a third person at a time sufficiently removed from trial where lapse of memory is not an unreasonable claim, discretion should normally allow a witness a chance to review it and then independently testify to the refreshed recollection. See Thompson v. United States, 5 Cir., 342 F. 2d 137.

to fill in memory gaps of any witness who is called to testify. Rosenthal v. United States, supra. And as previously demonstrated, *this was not evidence contradicting prior testimony of fact and subsequently adopted by the witness.* See Finnegan v. United States, 8 Cir., 204 F.2d 105.

No attempt was made to have the witness review the statement *in court* to properly refresh his recollection.

The witness stated he could not read *very well.* The prosecution and the court viewed this remark as one of hostility in light of his twelfth grade education. Nevertheless, the witness was not requested to review his statement at that time under oath to refresh his recollection. Perhaps the government considered it a futile gesture, but at this point, *where the witness had not damaged the government's case,* it was their only alternative course. The only motive the government had in reading the statement in front of the jury was an attempt to inject hearsay evidence into the case as substantive proof. If this procedure is approved, then ex parte statements may be substituted for courtroom testimony as long as the witness, friendly or hostile, is present to be cross examined by the other side. In principle, this same theory was urged, and refuted, in United States v. Rainwater, 8 Cir., 283 F.2d 386.[12]

▉▉▉ The rule requiring the witness to independently refresh his recollection without reading it aloud to the jury or having the statement itself offered into evidence assures that the witness is testifying in his own words.[13]

▉▉▉ We in no way retreat from the recognition that the greatest latitude should be allowed in the examination of witnesses by the trial judge. See Mitchell v. United States, 8 Cir., 208 F.2d 854. The propriety of declaring a witness "hostile" or finding "surprise" must necessarily remain in the trial court's discretion. The liberality of cross-examination, the propriety of a document to be used for refreshing recollection, the use of leading questions, as well as flexible means to impeach one's own witness, must always be within the trial judge's control. The trial judge should exercise his discretion with wide latitude to assure an atmosphere in which a witness will feel at ease in telling the truth. Ritualistic formality in

12. Distinguished professors and writers in the field of evidence have long urged the acceptance of *impeaching* hearsay statements as substantive testimony to be fully evaluated by the jury. 3 Wigmore, Evidence, § 1018 (3rd ed.); Ladd, "Impeachment of One's Own Witness—New Development", 4 Chi.L.Rev. 69 (1936); McCormick, Evidence, § 39 (1954). Through their influence the Uniform Model Code of Evidence [Rule 63(1)] and the American Law Institute [Rule 503(b)] have recommended the use of impeaching statements as substantive proof. This court has respectfully demonstrated this viewpoint to be "acknowledged heterodoxy." Ellis v. United States, 8 Cir., 138 F.2d 612, 617. The *Ellis* case was decided in 1943. Almost a quarter of a century later the empirical judgment of all courts, both state and federal, still follow the orthodox view, contrary to the liberal suggestions early espoused by Dean Wigmore. See 3 Wigmore, § 1018 (3rd ed. Supp.1964). The right to confront the witness at the time the statements are made is paramount in a criminal trial. U.S.Const.Amend.VI. See also, State v. Saporen, 205 Minn. 358, 361–363, 285 N.W. 898, 900–901 (1939).

13. Today the art of statement taking is a recognized science. Inbau & Reid, Criminal Interrogation & Confessions (1962); Schwartz, Trial of Automobile Accident Cases, Vol. I, § 4, pp. 5, 6, "Requisites of Witnesses Statements", 3rd ed. (1965); Smithson, Insurance Law Journal, June, 1958, "Liability Claims and Litigation", pp. 375–403; Schweitzer, Cyclopedia of Trial Practice, Vol. I, § 30, p. 58, "Securing Statements from Witnesses" (1954); Donaldson Casualty Claims Practice, "Richard D. Erwin Series in Risk & Insurance" (1964), pp. 481–500; Averbach, Handling Accident Cases, Vol. 2, p. 269, (1958). Whether the problem be one of fault in communication to a good faith interrogator or culpable strategy of the examiner, is immaterial. The fact remains, most ex parte statements reflect the subjective interest and attitude of the examiner as well.

presenting evidence should not deter untrained witnesses from telling their story in their own words. We hold here, it is only when evidence which is traditionally considered unworthy or unreliable, assumes the stature of undue significance that we must recognize error.

 In recognizing the error in the examination of Ghost Bear, we still are faced with the question whether the error assumes the magnitude of prejudice, requiring a new trial. Mr. Justice Rutledge's observations, in Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557, guide our determination. There is no doubt of the defendant's participation in the break-ins and the drinking spree. This is not denied. Appellant's only defense is that he was so "drunk" he was not aware of all of the events that took place on the nights in question. On the basis of the evidence presented, however, the jury found that the defendant had the requisite intent to commit the crime. Ghost Bear similarly professed to be intoxicated. Yet as part of the government's evidence was Ghost Bear's precise, detailed statement of fact reflecting a person fully aware of the events that ensued. It is impossible to say that this accurate recording of events could not reasonably influence a jury to believe that if Ghost Bear knew of these details, as reflected in such a thorough narrative, the defendant similarly had presence of mind to have sufficient intent to commit the crimes. The instruction by the trial court that the jury should consider the evidence as "affirmative proof" because the witness was "hostile" adds to the prejudicial use of the statement itself. See Brooks v. United States, 10 Cir., 309 F.2d 580. For these reasons we feel the error pervades the record. We reverse and remand the proceeding for a new trial.

Judgment reversed and remanded in accordance with this opinion.

*Appendix*

"Q. The statement that is given right above your signature 'I have read this statement of two pages and it is true and correct to the best of my knowledge.' Is that in your handwriting?

"A. Yes, sir.

"Q. And the signature that appears at the bottom of the first page of that exhibit, No. 6, is that your signature?

"A. Yes, sir.

"Q. Now, Delbert, when you signed this statement, you read it over then? Didn't you?

"A. Yes.

"Q. And it was a truthful statement, wasn't it?

"A. Yes, sir.

"Q. Now I am going to ask you with reference to August 20, 1964, if you made this statement: 'Around ten o'clock on August 20, 1964, Warfield Goings, Babe Sierra and I were together. Sierra suggested we break into Jack's Texaco Station in Pine Ridge, South Dakota. I don't know why he suggested this, but I agreed to it.' Is that a correct statement?

"A. I guess so.

"Q. Is it or isn't it?

"A. I guess it is.

"Q. Is it a correct statement?

"A. I think it is, I am not too sure.

"Q. You told them the truth at that time, didn't you?

"A. Yes.

"Q. Now then, so that is a true statement, then, isn't it?

"A. I am not sure, but I guess it is.

"Q. To the best of your knowledge, is that right?

"A. Yes.

"Mr. Butler: Your Honor, I believe this is going beyond what the Court would permit.

"The Court: Yes, he said it was a true statement.

"Q. Then going on: 'We went to the Texaco Station where Sierra got into the building through a window he opened. He then opened the front door and let Goings in. I stayed outside to watch out for the police. I did not go into the station.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'After about twenty minutes Sierra and Goings came out with some guns. I do not remember them having anything else.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'We then went to Annie Bissonette's house. At her house we divided the guns; I got one gun which was a rifle.' That's a correct statement, isn't it?

"A. I guess so, I'm not too sure.

"Q. Didn't you make this statement: 'I do not know what kind it was, I don't know what Goings or Sierra got as I was sort of drunk.' That's a correct statement, isn't it?

"A. Yes.

"Q. And didn't you make this statement: 'I can't remember what I did with the gun I got.'

"A. Yes.

"Q. Now I will show you what has been marked Ex. No. 7 and show you the second page where it says 'Delbert Wayne Ghost Bear', is that your signature?

"A. Yes, sir.

"Q. And the statement that appears right above that signature, is that in your handwriting?

"A. Yes, sir.

"Q. The statement which says 'I have read this statement of two pages and it is true and correct to the best of my knowledge.' Is that correct?

"A. I guess so, yes.

"Q. And the signature that appears on the bottom of page one, that's your signature, isn't it?

"A. Yes.

"Q. Now then, 'At around eight or nine P. M. on August 21, 1964, Warfield Goings, Albert Whiting, Babe Sierra, Ramona Two Two and I were all drinking wine and beer which I had bought. We were drinking at Annie Bissonette's house.' That's a correct statement, isn't it?

"A. Yes, sir.

"Q. 'Someone, I can't recall who, suggested we break into the Red Wing Cafe, Pine Ridge, South Dakota. I agreed to this.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'We went to the cafe where Sierra crawled into the building through a back window which Goings broke out. Whiting and Goings also climbed in through the window. Ramona and I stayed outside to watch for the police.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'About ten minutes after they went in Sierra and Whiting came out of the cafe with Whiting carrying a gum machine.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'We all went back to Bissonette's. I do not know what happened to the machine.' That's a correct statement, isn't it?

"A. Yes.

"Q. I will show you what has been marked as Ex. No. 8 and call your attention to the signature 'Delbert Wayne Ghost Bear' in the middle of that page, that's your signature, isn't it?

"A. Yes.

"Q. And the statement that appears right above that signature, 'I have read this statement of two pages and it is true and correct to the best of my knowledge.' Is that a correct statement?

"A. Yes.

"Q. Now then, the signature that appears at the bottom of Ex. No. 8, is that your signature?

"A. Yes.

"Q. Now, going to the statement itself, and to this particular paragraph: 'Around midnight on August 21 or 22nd, 1964, I, Warfield Goings, Albert Whiting, Ramona Two Two and Babe Sierra were together. We had been drinking. Goings suggested we break into Jack & Jean's Drive-in in Pine Ridge, South Dakota. We all agreed to this.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'We went to the drive-in, Sierra opened a window and crawled inside. He then came back out and said there was a dog inside.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'Goings had a 22 rifle with him and he broke a window out and shot the dog.' That's a correct statement, isn't it?

"A. I'm not sure, but I guess it is.

"Q. 'Sierra, Goings, and possibly Whiting, crawled inside, then I don't know for sure if Whiting did or not, Ramona and I were outside watching for the police.' That's a correct statement, isn't it?

"A. Yes.

"Q. 'Then someone, I'm not sure who, handed some food out the window to me. I did not hear any shots inside the building. After we got out the food, candy and potato chips, we left and went to Annie Bissonette's home and ate it.' That's a correct statement, isn't it?

"A. Yes.

"Q. Delbert, you pled guilty to this same matter, didn't you?

"A. Yes, I did.

"Q. And are you presently on probation?

"A. Yes, sir."

Then followed the cross-examination:

"Q. Do you remember the time on August 20th when you and Warfield caught a ride to Gordon for purpose of buying some beer and wine?

"A. Yes, sir.

"Q. And do you remember that you went down there and you bought I believe it was two cases of beer and a gallon of wine, is that correct?

"A. Yes, sir.

"Q. On the way back from Gordon to Pine Ridge you drank some beer, you drank about a six pack of it at that time?

"A. Yes, sir.

"Q. Then when you got back to Goings' house, you and Warfield and I believe Lester Sierra was there, isn't that correct?

"A. I guess so.

"Q. The three of you sat around Goings' house drinking the beer and wine, isn't that right?

"A. Yes, sir.

"Q. During that time wasn't there a time when you picked up some more wine, some half pints?

"A. Yes, sir.

"Q. That was while you were still at Goings' house?

"A. Yes.

"Q. You drank there how long would you say?

"A. I can't be too sure, but I think it was about three or four hours.

"Q. Then where did you go? Did you go to Mrs. Bissonette's house at that time after you left Goings' house?

"A. I can't be too sure because I was pretty drunk then.

"Q. You don't remember at that point?

"A. Yes.

"Q. Do you remember seeing Ramona Two Two that night, wasn't she at Bissonette's house?

"A. I guess so, I'm not too sure.

"Q. Did you keep drinking all night long as far as you can remember?

"A. As far as I can remember, yeah.

"Q. You think you were drunk that night, do you?

"A. Yes. . . .

"Q. The fact is, when you testified the first time you got on the stand you couldn't remember where you were on August 20th, the fact is you can't remember where you were on August 20th because you were too drunk, isn't that right?

"A. Yes, sir.

"Q. Now, Delbert, there's one other thing I want to ask you about, at this time in August, 1964, do you remember the practice that the boys had down there of sniffing glue, or was it gasoline?

"A. I guess so, yeah.

"Q. Was it glue or gasoline that you were sniffing?

"A. Who, me?

"Q. All of you?

"A. I can't remember too well.

"Q. Do you remember sniffing something that made you feel funny in the head?

"A. Yes, sir.

"Q. And you were sniffing it that night, too, weren't you?

"A. Yes, sir.

"Q. And that's another reason why you can't remember what happened that night, isn't it?

"A. Yes, sir.

"Q. And you were all doing it, too, that night—everybody that was there?

"A. I was taking the stuff, but I don't know about the other guys.

"Q. What were you taking?

"A. I was sniffing glue.

"Q. You were doing it that night?

"A. Yes.

"Q. You were drinking beer and wine that night, too, weren't you?

"A. Yes, sir."