UNITED STATES of America
v.
Woodrow WILLIAMS, Jr.
a/k/a Robert Walker.
Crim. No. 71-025-HM.

United States District Court,
D. Maryland.

Oct. 1, 1971.

John G. Sakellaris, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Joesph E. Emerson, Baltimore, Md., for defendant.

MEMORANDUM OPINION

HERBERT F. MURRAY, District Judge.

In this case the defendant was charged in a two-count indictment under Title 18, U.S.C.A. Sections 2113(a) and (b) with robbery of a branch of the Mary-

land National Bank in Cambridge, Maryland on December 4, 1970. The case was tried non-jury on September 13 and 14, 1971.

The basic facts are not in dispute. In a stipulation signed by government counsel, the defendant and his counsel, it was agreed that on the date set out in the indictment, the defendant went into the bank in Cambridge, Maryland and requested a loan from a branch officer of the bank. The officer declined to grant the defendant a loan. Thereafter the defendant walked up to Mrs. Martina Bennett, a teller, and handed to her a note stating "This is a stickup". Mrs. Bennett gave him all her cash, and defendant then left the bank with the money. It was also stipulated that Mrs. Bennett was intimidated by defendant giving her the note and for that reason turned over to defendant the funds in her drawer. An audit made immediately after the robbery showed the defendant had taken $4,727 of the bank's money.

While defendant thus does not contest the fact that a robbery occurred and he committed it, his counsel urges upon the Court that an essential element of the crime is lacking. It is contended that the two sections of the bank robbery statute on which the counts in the indictment are based both require a specific intent to steal, and that at the time of the robbery defendant was so intoxicated from alcohol and drugs that he was incapable of forming such specific intent.

The threshold legal questions thus are whether voluntary intoxication can negative specific intent as an element of crime and, if so, whether the offenses charged in either or both counts of the indictment require proof of specific intent. If specific intent is an element of the offense in either count of the indictment, the factual question then arises as to whether on all the evidence the degree of defendant's intoxication was such as to create a reasonable doubt that de-

fendant had a specific intent to steal when the robbery took place.

■ It is clear from the cases that while voluntary intoxication is ordinarily no defense to crime,[1] it may have that effect if specific intent is an element of the crime. Edwards v. United States, 84 U.S.App.D.C. 310, 172 F.2d 884 (1949) (housebreaking and larceny—specific intent required); Proctor v. United States, 85 U.S.App.D.C. 341, 177 F.2d 656 (1949) (unauthorized use of vehicle—specific intent not required); Allen v. United States, 239 F.2d 172 (6th Cir. 1956) (breaking into post office—specific intent required); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958) (robbery—specific intent required); Womack v. United States, 119 U.S.App.D.C. 40, 336 F.2d 959 (1964) (robbery under the D. C. Code—specific intent required); Rivers v. United States, 368 F.2d 362 (9th Cir. 1966) (theft from interstate shipment—intent to take goods required); Goings v. United States, 377 F.2d 753 (8th Cir. 1967) (burglary—intent to commit required); Kane v. United States, 399 F.2d 730 (9th Cir. 1968) (voluntary manslaughter—does not require specific intent), cert. den. 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969); United States v. Leeper, 413 F.2d 123 (8th Cir. 1969) (kidnapping—specific intent required).

The teaching of these cases is embodied in the recommended instruction on voluntary intoxication in Devitt and Blackmar, Federal Jury Practice and Instructions, Sec. 13.18 of Vol. 1, 2nd Edition which reads:

*"Voluntary Intoxication*

Although intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent.

1. Wheatley v. United States, 159 F.2d 599, 602–603 (4th Cir. 1946); Driver v. Hinnant, 356 F.2d 761, 764 (4th Cir. 1966).

"So, evidence that a defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the defendant acted, or failed to act, with specific intent, as charged."

The rule has also been adopted by the American Law Institute. Model Penal Code, Tentative Draft No. 9, Section 2–08.[2]

█ Thus in the area of criminal responsibility as affected by voluntary intoxication, a distinction must be drawn between so-called "general intent" to commit a crime and a "specific intent" to do a particular criminal act.

These terms are often used in the cases but seldom defined.[3] An illustration of a general intent sufficing for conviction is the case of A intending to strike B but instead striking C. A is yet guilty of assault and battery, or, if the striking results in death, of homicide, even though A had no specific intent to harm C. Ginsberg, Criminal Law and Procedure in Maryland (1940), p. 25. On the other hand, there are certain crimes such as burglary and larceny where the act must be accompanied with a specific intent. Thus at common law in larceny there must be a taking and carrying away of the property of another *with the intent* to permanently deprive that person of his ownership of the goods. In burglary there must be a breaking and entry of a dwelling house in the night-time *with the intent* to commit a felony therein. Holmes in his work *The Common Law*

suggests (p. 74) that the object of punishing such breaking and entering is not to prevent trespasses, even when committed by night, but only such trespasses as are the first step to wrongs of a greater magnitude, like robbery or murder. He further suggests that if the apprehended act did follow, then it is no longer necessary to allege that the breaking and entering was with that intent. "An indictment for burglary which charges that the defendant broke into a dwelling-house and stole certain property, is just as good as one which alleges that he broke in with intent to steal".

Did Congress in the several subsections of the bank robbery statute create "general intent" crimes or "specific intent" crimes? Some cases uncritically lump all subsections of the statute under the "specific intent" label. Other cases ascribe more careful draftsmanship to the Congress, and find a specific intent an element of the crime only in those subsections of the statute where the language "with intent" is used.

Thus, in United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970), cert. den. 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970), the indictment was under 18 U.S.C.A. Sections 2113(a) and (d). On appeal the defendant contended that the crime was of the common law larceny genus requiring allegation and proof of specific intent. The Court rejected this argument, stating at pages 490–491:

"Six specific crimes are set out in Section 2113. Felonious intent is specifically incorporated in the definition of

---

2. Sec. 2.08 *Intoxication*
   (1) Except as provided in Subsection (4) of this Section, intoxication of the actor is not a defense unless it negatives an element of the offense.

3. The 9th Circuit in *Rivers v. United States*, 368 F.2d 362, p. 364 (1966) approved the following instruction:
   "Specific intent, as the term itself suggests, requires more than a mere general intent to engage in certain conduct.
   "A person who knowingly does an act which the law forbids, or knowingly fails to do an act which the law requires, intending with evil motive or

bad purpose either to disobey or to disregard the law may be found to act with specific intent."

A similar instruction is recommended in Devitt and Blackmar, Federal Jury Practice and Instructions, Vol. 1, Sec. 13.03 except that the language "intending with evil motive or bad purpose either to disobey or to disregard the law" is omitted and instead the instruction concludes that the act or failure to act must be done "purposely intending to violate the law." See also for a comparable instruction United States v. Porter, 431 F.2d 7 (9th Cir. 1970), cert. den. 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970).

two of them: entering a federally insured institution with intent to commit a felony (a—second paragraph), and taking property with intent to steal or purloin (b). However, it is not made part of the crimes of taking by force and violence or by intimidation (a—first paragraph); knowingly receiving stolen property (c); assaulting or putting in jeopardy the life of a person by a dangerous weapon (d); or killing a person, or forcing a person to accompany him, while in the course of committing one of the other offenses or avoiding apprehension or confinement for any of them (e).

"This differentiation shows careful draftsmanship. Entering and taking can be innocent acts, and therefore require felonious intent to constitute crime *; receiving stolen property can be innocent, unless done knowingly. However, the other offenses describe acts which, when performed, are so unambiguously dangerous to others that the requisite mental element is necessarily implicit in the description.* *Contra*: United States v. Margeson, Cr. No. 64–26 (D.Me. 1964). It therefore is immaterial for sections 2113(a) and (d) whether the subjective intent of a bank robber is to steal that to which he has no claim or to recover his own deposit; the crime is his resort to force and violence, or intimidation, in the presence of another person to accomplish his purposes. United States v. Lester, 287 F.Supp. 870 (E.D.Pa.1967), aff'd 399 F.2d 161 (3d Cir. 1968); Pitman v. United States, 380 F.2d 368 (9th Cir. 1967)." (* Footnotes omitted)

See also the opinion of the 5th Circuit in Prince v. United States, 230 F.2d 568 (1956) [reversed for resentencing because of merger of lesser offense of entry with completed offense of robbery, Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957)].[4] Compare United States v. Porter, supra note 3.

■ The Court in the present case concludes as a matter of law that the distinction made by the 1st Circuit in *DeLeo* and by the 5th Circuit in *Prince* is a valid one, and that the act of the defendant, which he admits of taking by intimidation from the presence of another money belonging to the bank, constitutes a violation of subsection (a) of the statute as charged in Count I of the indictment. The Court rejects as a defense to the crime charged in Count I of the indictment any voluntary intoxication of the defendant.

■■ As to Count II of the indictment, the Court feels that historically and legally the contention of the defendant is correct, and that a specific intent to steal is an element of the crime. The Court on a review of all the evidence in the case is satisfied beyond a reasonable doubt that defendant when he took and carried away money belonging to the bank exceeding $100 in value did so with the intent to steal or purloin.

The Court in finding as a fact that defendant had the intent to steal is not unmindful of the fact that there was substantial evidence to show that defendant had imbibed significant quantities of alcohol and drugs, but the Court from all the evidence finds beyond a reasonable doubt that he both had the capacity to and did intend to steal when he took the bank's money. The basis for the Court's finding in this regard requires some reference to the evidence of defendant's taking of alcohol and drugs and his condition at the time of the robbery.

In testifying on his own behalf, defendant claimed that as a result of an argument with his wife he started drink-

4. The circuit court contrasted the robbery and larceny subsections, 2113(a) and (b), as follows: "These are differentiated, however, by the fact that larceny under the statute requires the 'intent to steal or purloin,' while this element of specific criminal intent is omitted from the first paragraph of (a), thus apparently making sufficient for conviction under (a) only the general criminal intent to do the prohibited acts themselves." 230 F.2d at p. 571.

ing with a companion around 9:00 A.M. on December 3, 1970, the day before the robbery and over the next fourteen hours the two consumed three fifths of whiskey, of which defendant had about half. During this period defendant also took 6 or 7 "yellow jackets" or barbiturate pills. Between midnight on December 3 and the occurrence of the robbery around 1:00 P.M. on December 4, defendant claims that he and a companion drank an additional one or one and a half fifths of whiskey, of which defendant had all but half a pint. In addition, sometime in this latter period defendant took some LSD pills, with the result that he had only "spotty" recollection of events the morning of the robbery. Defendant does recall going into the bank and talking with the branch officer, and leaving the bank stuffing money under his jacket, but disclaims any recollection of confronting the teller, presenting her with a "stickup" note and actually receiving from her over $4,000 in cash.

The witnesses who actually observed the defendant on the day of the robbery indicate he had been drinking but not that he was drunk. A cab driver named Hopkins who drove the defendant at 6:00 A.M. to redeem his watch and then to a drive-in said his eyes were red and he had been drinking. His speech was "heavy" and he did not seem to walk normally.

Mrs. Florence Brannock, a teller in the bank, spoke briefly with defendant when he asked for the loan department and directed him to the branch officer. She felt he smelled strongly of cheap wine or alcohol and that his speech while understandable was not normal—it was a little "slurred" or "thick".

Branch Officer John Bramble testified that the defendant came into his office seeking a $400 loan for Christmas. In their conversation defendant gave his place of employment, said he owned a 1969 Chevrolet and had an account in the Farmer's and Merchant's bank across the street. The witness said he could smell a strong odor of alcohol on the defendant's breath and felt he was under the influence of liquor and that he also appeared somewhat nervous. After declining to grant the defendant a loan, the witness watched the defendant walk towards the lobby of the bank and could not remember anything unusual about the defendant's walk.

Mrs. Martina Bennett, a cash teller, recalled that a little after 1:00 P.M. a man approached from the side aisle of the bank. She recalled having seen him previously at Mrs. Brannock's desk. He put a note on her counter and said nothing. At first she thought he might be deaf and read the note. It was printed in pencil on a torn piece of paper and read "This is a stickup". She noticed that he had his right hand in his jacket pocket which was thrust forward pointing at her as though he had a gun. She was terrified and afraid he was going to shoot her. She put all her money on the counter, but she did not see what he did with it, although she believes he dropped some and then picked it up. She noticed nothing unusual about the defendant's appearance and did not smell any alcohol. When he was standing before her he did not appear to waver, but his eyes did appear sleepy. She watched him walk away from her counter and down a flight of four steps leading to the lobby entrance.

A cab driver witness named Wilson Wright testified defendant and two other men approached him around 5:00 P.M. on December 4, 1970 in Salisbury, Maryland. He took the men to two different destinations in Salisbury and then the defendant and one of the men hired him to take them to Hartsville, South Carolina where the other man, "Charles", lived. The witness noticed the defendant had a large sum of money in a bag, which the defendant said was earned in five years of work in Vietnam. The witness said the defendant looked and acted normal while they were in Salisbury, but en route to Virginia the defendant and his companions were drinking from two fifths of whiskey and the defendant fell into a deep sleep about 8:30 P.M. About 4:00 A.M. the witness left the two men

**6**

off at a house in Hartsville, South Carolina, and that was the last he saw of the defendant.

The testimony as to acts of the defendant closest in time to the robbery was given by the owner of a small store in Cambridge, George Heist. His store is located about two blocks from the bank. He recalled that the defendant came into his store about noon and asked for a piece of paper to figure a bill. The defendant reached for a sales pad but the witness did not want the defendant to use the pad and gave him a piece of paper instead. The defendant turned around with his back to the witness and put the piece of paper on top of some stocking boxes and started to write. Apparently dissatisfied, he balled up the piece of paper and threw it on the floor. Defendant reached again for the witness' sales paid, which the witness again refused to give him, tearing off a piece of old calendar paper instead. Defendant again turned around and wrote some more, and then left the store.

The witness said that the defendant while in his store seemed coherent, didn't stagger, and acted normally except for trying to take his sales pad twice. However, because the defendant "seemed a little high on something" he decided, after the defendant left the store, to read what was on the balled up piece of paper. It read "This is a stick". Although defendant on leaving the store walked away from and not towards the bank, the witness appropriately concluded a robbery might be in prospect and got a policeman to whom he gave a description of the defendant. Later he heard the fire whistle blow about 1:00 P.M., which was a signal that the bank had been robbed.

Dr. Leonard Rothstein, a private psychiatrist called by defendant, had an interview examination with defendant on May 24, 1971 and also talked to defendant's wife. The defendant gave the doctor a history of abusing alcohol since age 19, and told the doctor he was drinking beer all day before the robbery and took some "yellow jackets" in the evening, and some LSD in the morning before the robbery. Dr. Rothstein found no significant evasiveness in the defendant and no discrepancies between defendant's account and his wife's.

On the basis of defendant's account to him and his examination the doctor expressed the opinion that at the time of the offense the defendant had no psychosis or structural alteration in the brain. However, the doctor concluded from what the defendant told him of his ingestion of alcohol and drugs that the higher centers governing the making of judgments, control of behavior and retention of experience in memory had been affected. While the defendant knew what he was doing, his judgment about the appropriateness of his actions and his ability to control them were severely impaired. From the history the doctor concluded the defendant had taken the alcohol and drugs voluntarily and with knowledge from previous experience of their probable effect. In response to a hypothetical question asked on cross examination by counsel for the government, the doctor admitted that if the defendant had not taken alcohol and drugs before the offense, he would at the time have had no psychiatric illness and would have had the capacity to conform his conduct to the requirements of the law.

Dr. William Fitzpatrick, who had examined the defendant on July 15, 1971 at the request of the government, was called as an expert psychiatric witness by the defense. He related a personal history and account of the offense given him by the defendant very similar to that related by defendant's own expert, Dr. Rothstein. He found the defendant of normal intelligence with no evidence of psychosis or structural brain disorder. From the history he judged defendant to be a passive dependent personality of the type more likely to abuse alcohol than the average person. Although from defendant's own account he was an episodic heavy user of alcohol and drugs, he did not find evidence that he was an alcoholic or a drug addict. He felt that because defendant was a passive dependent type

he had a condition something short of total mental health. However, had the defendant not taken alcohol and drugs at time of the offense, he would not consider that defendant lacked criminal responsibility or capacity to conform his conduct to the requirements of the law. Although the doctor did not know the quantity of alcohol or drugs defendant consumed before the offense, he assumed the defendant was intoxicated at the time and that his intoxication was self-induced with knowledge on the part of the defendant that he would get drunk if he drank. He admitted that if he assumed a lesser degree of intoxication he would have to alter his opinion, but his opinion that defendant at the time of the offense could not conform his conduct to the requirements of the law was based on assumed intake of large quantities of alcohol. However, the doctor honestly disclaimed any opinion on whether defendant could specifically intend to rob a bank.

In expressing their conclusions, both psychiatrists obviously had in mind the ALI formulation contained in Model Penal Code, Section 4.01, approved in this circuit in United States v. Chandler, 393 F.2d 920 (1968). However, defense counsel disclaimed any contention that this standard was applicable in determining the issue of the criminal responsibility of this defendant. In this connection it is noted that Section 2.08(3) of the Model Penal Code provides "Intoxication does not, in itself, constitute mental disease within the meaning of Section 4.01."

As then Circuit Judge Burger stated in Heideman v. United States, 104 U.S. App.D.C. 128, 259 F.2d 943, at p. 946 (1958): "Drunkenness, while efficient to reduce or remove *inhibitions,** does not readily negate *intent.**" (*Footnotes omitted)

The Court believes that the defendant had taken alcohol and drugs to the point of being "under the influence" but that he was not so intoxicated as not to understand what he was doing or to not have the intention to steal from the bank.

There is a marked difference between the accounts of the persons who observed defendant and defendant's own account as to his condition. It appears from a witness called by the defense that he was able to write a "stickup" note shortly before the robbery, to go into the bank, hold a coherent conversation about a loan, present the note, obtain over $4,000 in cash, none of which has been returned, and make good his escape. The Court concludes beyond a reasonable doubt that defendant had the intent to steal from the bank as required for conviction under Count II, and that he is in any event guilty under Count I of the indictment. If an intent to steal is an element of the offense charged in Count I, the Court finds that intent proved as to Count I also. The Court therefore finds the defendant guilty as charged in both counts of the indictment.