Joseph **WILKINS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 89–746.

District of Columbia Court of Appeals.

Argued Sept. 11, 1990.
Decided Nov. 27, 1990.

---

Richard S. Greenlee, Public Defender Service, with whom James Klein and Henderson Hill, Public Defender Service, were on the brief, for appellant.

William Ho–Gonzales, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant was indicted for second-degree murder while armed for the stabbing death of Earl Jones.[1] A jury acquitted appellant of that charge but found him guilty of the lesser included offense of manslaughter while armed.[2] On appeal from his conviction, appellant contends that the trial court erred in allowing the prosecutor to quote from the grand jury testimony of a government witness in an unsuccessful attempt to refresh that witness' recollection. We agree, reverse the conviction, and remand the case for a new trial.

I

Appellant Wilkins shared an apartment on W Street, N.W., with his girl friend, Mary Helen Bethea, and her daughter, Deborah Pipkin. The decedent, Earl Jones, was a friend of both Wilkins and Bethea, and had been romantically linked with Bethea before she became involved with Wilkins. The government's case against Wilkins was based on the theory that Bethea and Jones were continuing their relationship, and that Wilkins murdered Jones out of jealousy after seeing Jones and Bethea together.

On the afternoon of December 19, 1987, Wilkins and Deborah Pipkin drove to Bethea's place of work with Joseph Tyson, Pipkin's boy friend. Upon learning that Bethea was not at work, they went to two other places and eventually returned to the W Street apartment. Tyson and Pipkin waited in the car while Wilkins went inside to use the bathroom and make a telephone call. While he was inside, Bethea and Jones came walking up W Street and entered the apartment building together. A short time later, Jones and Wilkins became involved in the fight in which Jones received his fatal stab wounds.[3]

1. D.C.Code §§ 22–2403, 22–3202(a) (1989). .

2. D.C.Code §§ 22–2405, 22–3202(a) (1989).

3. A neighbor, Augustus Wiggins, testified that he saw Wilkins and Jones fighting in the second-floor hallway. When he first saw the two men struggling, Wilkins had one arm around Jones' neck in a "yoke" hold and was striking at Jones with his other hand. However, Wiggins did not see any object in either of Wilkins' hands. Wiggins left to report the fight to his landlord, who lived nearby, and when he returned, Jones was outside on the street.

Testifying in his own behalf, Wilkins admitted that he had fought with Jones but denied stabbing him.[4] Wilkins claimed that he was acting in self-defense. He said that Bethea came into the apartment alone just as he was leaving to join Tyson and Pipkin in the car outside. He then met Jones in the hallway and told him to leave because he was on his way out. Suddenly, Wilkins testified, Jones rushed toward him with a knife in his hand. After a brief struggle, Jones fell down the stairs and tumbled out onto the front steps of the building. Wilkins followed Jones downstairs and threw him off the front steps because the landlord did not want anyone sitting there. Although Jones died shortly thereafter, Wilkins said he did not realize that Jones was badly injured.

Wilkins denied that he was jealous of Jones and testified that he would not have been bothered if Bethea had been seeing other men. He confirmed that he had heard people say that Jones came to visit Bethea at the apartment when he was not there, but he denied having any actual knowledge to that effect.[5]

Deborah Pipkin, Bethea's daughter, was called to rebut Wilkins' testimony that he was unaware that Jones had been seeing her mother. Pipkin testified that Wilkins had threatened Bethea, but she did not remember anything Wilkins might have said to Jones. The prosecutor then asked Pipkin if looking at her grand jury testimony would refresh her recollection. Defense counsel objected that the prosecutor[6] was trying to impeach her own witness, but the court overruled the objection, whereupon the prosecutor handed Pipkin a copy of her grand jury testimony. After looking it over, Pipkin essentially repeated the testimony she had just given a few minutes earlier.

■ The prosecutor once again referred Pipkin to her grand jury testimony, directing her attention to particular lines in the transcript. After Pipkin had read the testimony to herself, the following exchange occurred:

Q. And ... looking at those lines, does that refresh your memory as to whether Joe [Wilkins] said anything else to Earl [Jones] when he slammed him to the ground?

A. You say when—after work or something?

Q. Well, I'm asking you—you have now had a chance, have you not, to look at your grand jury testimony. *What else did Joe say to Earl that day* at the time when he was slammed to the ground?

[DEFENSE COUNSEL]: Your Honor—

THE COURT: No, wait a minute. Wait a minute. Let's—

[DEFENSE COUNSEL]: Okay.

THE COURT: —see.

THE WITNESS: I don't understand. I don't understand what she's—

[DEFENSE COUNSEL]: Your Honor, may I make a suggestion? Want to come to the bench?

THE COURT: Well—

[DEFENSE COUNSEL]: If she asks does that refresh her recollection, maybe—

THE COURT: You want to make reference to it or do you want to make the statement?

[THE PROSECUTOR]: I will make the statement.

BY [THE PROSECUTOR]:

Q. Now, Ms. Pipkin ... did you in fact state that Joe also said—*this is a quote*—you be coming down when the man be at work?

A. Yeah.

Q. So he did say that?

---

4. Dr. Silvia Comparini, the deputy medical examiner, testified that Jones' fatal wounds were caused by a sharp, single-edged blade, at least five inches in length. No weapon fitting this description was ever found. A box cutter was recovered at the scene, but Dr. Comparini said that it could not have caused the wounds.

5. Mary Helen Bethea testified that she had not been with Jones on the day he was stabbed. The defense also called two character witnesses, who testified that Wilkins had a reputation as a peaceful man.

6. The government is represented by different counsel on appeal.

A. No, I'm saying he, when, when, when, when Joe be at work, Earl, Earl used to come to my mother's house. [Emphasis added.]

Defense counsel did not object again at this point.[7] The trial court did not then give a limiting instruction to the jury. In its final charge the court did give a general instruction on the limited purpose for which the jury might consider a prior inconsistent statement, but it did not refer specifically to Pipkin's testimony.

## II

■ The procedure for refreshing the recollection of a witness with his or her prior testimony, or any other written statement, is well summarized in *Goings v. United States*, 377 F.2d 753, 760–761 (8th Cir.1967). Under *Goings*, the examining attorney must first establish that the witness' memory of the event is exhausted. The statement should then be shown to the witness, who should read it silently. The attorney should next determine, by appropriate questions, whether reading the statement has actually refreshed the witness' memory. If it has, then the witness may testify, *independently of the statement*, as to his or her present recollection. While *Goings* is an Eighth Circuit case, and therefore not binding on this court, it is clear that the method of refreshing recollection described in *Goings* is the proper procedure to be followed in the District of Columbia. *See, e.g., Jones v. United States*, 579 A.2d 250, 252 (D.C.1990).

■ *Goings* also states that to read a witness' prior statement aloud for the purpose of refreshing recollection is "patent error." 377 F.2d at 761. Controlling case law in the District of Columbia is to the same effect. In *Gaines v. United States*,

121 U.S.App.D.C. 213, 349 F.2d 190 (1965), the trial court allowed the prosecutor to read his own witnesses' prior statements aloud in the presence of the jury for the purpose of refreshing their recollection. The Court of Appeals held that this was error, even though the trial court carefully instructed the jury that the statements were not evidence of the truth of their contents.

To refresh the witnesses' recollection, it was not necessary for counsel to read the statements aloud in the jury's presence. This [was] liable to cause the jury to consider their contents as evidence notwithstanding the instructions to the contrary.

*Id.* at 215, 349 F.2d at 192 (citations omitted).[8]

In an earlier case, *Young v. United States*, 94 U.S.App.D.C. 62, 214 F.2d 232 (1954), the prosecutor sought to elicit certain testimony from his own witness. When the witness said he did not know the answer to the prosecutor's question, he was handed a copy of his grand jury testimony, which he read silently to himself. He then said that, although his recollection was refreshed, he still did not know the answer to the question. Over defense counsel's objection, the court allowed the prosecutor to quote, directly and at length, from the grand jury testimony and then to ask the witness whether he had so testified; the witness replied that he had. No limiting instruction was ever given. The Court of Appeals reversed the defendant's conviction, holding that the prosecutor, unsatisfied with the witness' testimony, had gone beyond mere refreshment of recollection and had violated the defendant's Sixth Amendment right of confrontation by read-

---

7. The government contends that we must review Wilkins' claim of error under the plain error standard set forth in *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc), because defense counsel failed to object when the prosecutor actually read Pipkin's grand jury testimony aloud in front of the jury. We do not agree. An objection to evidence, once made and overruled, need not be renewed to the same type of evidence subsequently received. *See* E. CLEARY, McCORMICK ON EVIDENCE § 52, at 132 (3d ed.1984); 88 C.J.S. *Trial* § 122 (1955). It is clear from the

record that defense counsel made three separate attempts to object to the prosecutor's improper method of refreshing the witness' recollection. Once the court implicitly overruled the objection by allowing the prosecutor to proceed, defense counsel did not need to object again to preserve his claim of error on appeal.

8. The court held, however, that the error was harmless and affirmed the conviction.

ing the grand jury testimony aloud. "Cross-examination to refresh a witness' recollection on the basis of prior statements may be permitted ... but the contents of the statements are not to be put in evidence before the jury." *Id.* at 68, 214 F.2d at 237–238.

■■■ *Young* and *Gaines* compel us to hold that the prosecutor's quoting from Deborah Pipkin's grand jury testimony in an effort to refresh her recollection was improper.[9] At no time did Pipkin state, or even suggest, that her memory was exhausted. The prosecutor never established that Pipkin could not testify from present memory before seeking to elicit the desired response. When Pipkin would not say what the prosecutor wanted her to say, the frustrated prosecutor impermissibly read the damaging portion of her grand jury testimony in front of the jury. "This was not refreshing the witness' recollection. It was placing before the trial jury testimony previously given before a grand jury when there had been no cross-examination and

defendant was not confronted with the witnesses against him." *Young, supra,* 94 U.S.App.D.C. at 68, 214 F.2d at 237. We agree with the *Goings* court that this was "patent error." 377 F.2d at 761.[10]

### III

■■■ Our remaining task is to decide whether the error requires reversal or whether it was harmless. We conclude that it was not harmless.[11]

The case against Wilkins was based on the theory that jealousy motivated him to kill Jones. Wilkins, however, denied having any knowledge that Jones was visiting Bethea in his absence. The alleged statement by Wilkins which the prosecutor improperly read aloud in the jury's presence —"you be coming down when the man [Wilkins] be at work"—was the only piece of evidence rebutting Wilkins' claim that he did not know Jones was seeing Bethea and establishing jealousy as a motive for the killing.[12] Jealousy was at the heart of the

---

9. However, we do not accept appellant's characterization of the prosecutor's use of the grand jury testimony as "impeachment." The prosecutor never pointed out any inconsistency between the two statements either to the witness or to the jury, nor did she ever suggest that Pipkin was not a credible witness. Thus, while the prosecutor's reading aloud from the prior testimony was improper, it did not constitute impeachment. The prosecutor was simply trying to refresh the witness' recollection, but she did it the wrong way. (For an example of the right way, *see Jones v. United States, supra.*)

10. We reject appellant's contention that the prosecutor committed a similar impropriety later in the trial. On that occasion, when Pipkin said she could not remember whether Wilkins had said anything to her mother on the day of the killing, the prosecutor again showed Pipkin a portion of her grand jury testimony. This time, however, the prosecutor did not read aloud from the transcript, nor did she ask if Pipkin's recollection was refreshed; instead, she simply repeated the question, "And what did Joe say to your mother that day?" Pipkin answered, "He said, I'm going to get you later.... [H]e can always get her, but he just wanted that man [Earl Jones] right now." It is not clear whether this statement was actually part of her grand jury testimony, but if it was, the context makes clear that Pipkin adopted it as her testimony at trial. The jury could therefore consider it as substantive evidence. *Jones v. United States, supra,* 579 A.2d at 253.

11. Although the court in *Young* held that the error violated the defendant's Sixth Amendment right of confrontation, more recent Supreme Court case law suggests that the Sixth Amendment may not be implicated here because Pipkin actually testified at trial and was available for cross-examination. *See, e.g., California v. Green,* 399 U.S. 149, 153–164, 90 S.Ct. 1930, 1932–1938, 26 L.Ed.2d 489 (1970); *cf. United States v. Owens,* 484 U.S. 554, 557–560, 108 S.Ct. 838, 841–843, 98 L.Ed.2d 951 (1988) (no Sixth Amendment violation in admitting evidence of out-of-court identification by assault victim who testified at trial, even though post-traumatic amnesia made it impossible for defense counsel to cross-examine victim about that identification; "opportunity to cross-examine" satisfies Confrontation Clause). We need not decide this point, because we are satisfied that the error in the case at bar does not meet the test for harmlessness under either *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (constitutional harmless error), or *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) (non-constitutional harmless error).

12. Earlier in the trial, Joseph Tyson testified that on the morning of the stabbing he was present during a conversation between Wilkins and Deborah Pipkin, in which Wilkins said that he "wasn't going to kill him [Jones]" but would "make him wish he was dead." As he said this, Tyson testified, Wilkins had a knife in his hand,

government's case. We therefore hold that allowing this statement to be heard by the jury so substantially prejudiced Wilkins' defense that the only remedy for the error is a new trial.

*Reversed and remanded.*

"just flicking it, that's all." While this testimony shows that Wilkins had a grievance against Jones and might cause him some harm, it sheds no light on the reason for the grievance.